# 22-1318-cv(L),
## 22-1362-cv(CON), 22-1386-cv(XAP)

IN THE
### United States Court of Appeals
### for the Second Circuit

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and
STATE FARM FIRE AND CASUALTY INSURANCE COMPANY,

*Plaintiffs-Appellees/Cross-Appellants,\**

On Appeal From the United States District Court
for the Eastern District of New York

**PRINCIPAL AND RESPONSE BRIEF FOR
PLAINTIFFS-APPELLEES-CROSS-APPELLANTS
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
AND STATE FARM FIRE ANDCASUALTY INSURANCE COMPANY**

Jonathan L. Marks
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL  60661-3693
Tel: 312-902-5200

Christopher T. Cook
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020-1605
Tel.: 212-940-6488

Robert T. Smith
Mary C. Fleming
Ally Jordan
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
North Tower – Suite 200
Washington, DC  20007-5118
Tel:  202-625-3500

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

*\* Caption Continues on Inside Cover*

_____

– v. –

TRI-BOROUGH NY MEDICAL PRACTICE, P.C., METRO PAIN SPECIALISTS P.C., LEONID SHAPIRO, M.D., REUVEN ALON, AKA ROB ALON, COLUMBUS IMAGING CENTER LLC, MEDAID RADIOLOGY LLC, YAN MOSHE, AKA YAN LEVIEV, HACKENSACK SPECIALTY ASC LLC, FKA DYNAMIC SURGERY CENTER LLC, INTEGRATED SPECIALTY ASC LLC, FKA HEALTHPLUS SURGERY CENTER LLC,

*Defendants-Appellants/Cross-Appellees,*

MOHAMED SAYED AHMED HASSAN, P.T., NILE REHAB PHYSICAL THERAPY, P.C., MOHAMED ELSAYED KHALLAF, P.T., HANDY PHYSICAL THERAPY P.C., IRINA KATAEVA, P.T., CITYWORKS PHYSICAL THERAPY P.C., MAHMOUD EZZ ELDEEN SHALABY, P.T., PHYSICAL THERAPY OF NEW YORK P.C., AMRO MAHMOUD BARAKAT, P.T., BARAKAT PT, P.C., MOHAMED MAHMOUD ELMANDOUH, P.T., PROTECTION PHYSICAL THERAPY P.C., RAOUF AKL, P.T, PRIMAVERA PHYSICAL THERAPY, P.C., AHMED MAHMOUD ABDELSH ELMANSY, P.T., SKY LIMIT PHYSICAL THERAPY, P.C., GEOFFREY ALLERTON CUSHMAN, P.T., PI PHYSICAL THERAPY, P.C., SHERWIN CATUGDA PALLER, P.T., FLORAL PARK PHYSICAL THERAPY, P.C., ALPESHKUMAR MANUGHAI PATEL, P.T., A. M. PATEL PHYSICAL THERAPY P.C., LEONARD LUNA, D.C., KINGS CHIROPRACTIC WELLNESS, P.C., JONGDUG PARK, D.C., ALL ABOUT CHIROPRACTIC P.C., J PARK CHIROPRACTIC P.C., GIULIO CARUSO, D.C., BROOK CHIROPRACTIC OF NY P.C., INTEGRATED CHIROPRACTIC OF NY P.C., PETER ALBIS, D.C., PDA NY CHIROPRACTIC P.C., PAUL VICTOR SCARBOROUGH, D.C., A.O.T. CHIROPRACTIC P.C., EVOLUTION CHIROPRACTIC P.C., STACY JUYOUNG MOON, L.AC., SJM ACUPUNCTURE P.C., LYUDMILA KRUPNOVA, L.AC., LK ACUPUNCTURIST P.C., HYEONGSOCK CHOI, L.AC., CHOICE ACUPUNCTURE PLLC, CHOI-GO ACUPUNCTURE PLLC, PETER KOPACH, L.AC., FIRST ALTERNATIVE PLM ACUPUNCTURE P.C., EDWIN CASTILLO, L.AC., EDCAS ACUPUNCTURE P.C., LONGYU MA, L.AC., HIDDEN DRAGON ACUPUNCTURE P.C., XIA GUAN, L.AC., REBOUND ACUPUNCTURE P.C., REGINA MOSHE, M.D, CITIMEDICAL I, PLLC, VLADIMIR NAZAROV, RIGHT AID MEDICAL SUPPLY CORP.

*Defendants.*

_____

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Plaintiffs-Appellees-Cross-Appellants hereby make the following disclosures:

1. State Farm Mutual Automobile Insurance Company has no parent company and, as a mutual automobile insurance company, has no shareholders.

2. State Farm Fire and Casualty Company is a wholly owned subsidiary of State Farm Mutual Automobile Insurance Company.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT........................................ i

TABLE OF CONTENTS .............................................................ii

TABLE OF AUTHORITIES.........................................................v

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ................................................ 5

STATEMENT OF THE ISSUES................................................... 6

STATEMENT OF THE CASE ..................................................... 8

    A.   The District Court Proceedings.......................................... 8

    B.   Defendants' Fraudulent Scheme. ....................................12

        1.   Defendants' Fraud Is Predicated on Exploiting New York's No-Fault Laws. ........................................................12

        2.   Defendants Submit Fraudulent Bills for Medically Unnecessary Services Rendered Pursuant to a Predetermined Treatment Protocol and Unlawful Referrals and Kickbacks.......................................15

        3.   Defendants Use Arbitrations and State-Court Litigation to Further Their Fraudulent Scheme. ........................19

SUMMARY OF THE ARGUMENT ..............................................20

STANDARD OF REVIEW .........................................................27

ARGUMENT........................................................................28

I.   As to Defendants' Appeal, the District Court Did Not Abuse Its Discretion in Preliminarily Enjoining Future and Pending Arbitrations, and Future State-Court Litigation. .....................28

    A.   Because the State Farm Companies' Claims Are Not Susceptible to Litigation in Defendants' Individual No-Fault Actions, the State Farm Companies Would Be Irreparably Harmed Absent the Injunction. ....................................28

1. Absent an Injunction, the State Farm Companies Risk Being Unable to Fully Vindicate Their Fraud Claims In Any Forum..................................................................29

2. Absent an Injunction, Defendants Will Use Reimbursements Paid by the State Farm Companies to Perpetuate the Fraud, Dissipate Assets, and Waste Time and Resources. ..........................................................37

B. The State Farm Companies Have Raised Serious Questions Going to the Merits Sufficient to Make Them Fair Grounds for Litigation. ...............................................................42

C. The Balance of the Equities Tips Decidedly in Favor of the State Farm Companies..................................................48

D. The Public Interest Supports Enjoining Defendants' Massive Fraud. ...................................................................53

II. As to Defendants' Appeal, the District Court Correctly Determined the FAA Does Not Bar the Enjoining of Future and Pending Arbitrations. ............................................................54

III. As to the Cross-Appeal, Two Exceptions to the Anti-Injunction Act Permit the District Court to Enjoin Defendants' Pending State-Court Actions. ........................................................58

A. The Injunction Was Expressly Authorized by an Act of Congress......................................................................59

1. RICO is a Unique Federal Remedy that Authorizes Private Parties to Obtain Injunctive Relief. ...........................60

2. RICO Could Be Given Its Intended Scope Only by a Stay of the State-Court Proceedings. ................................63

3. The District Court Erroneously Held the "Expressly Authorized" Exception Applies Only to Claims Subject to Exclusive Federal Jurisdiction..................................69

B. The Injunction Was Necessary in Aid of the District Court's Jurisdiction Because Defendants' State-Court Proceedings Would "Seriously Impair" the Court's Ability to Resolve the State Farm Companies' Claims in Any Forum...................76

IV. As to Defendants' Appeal, the District Court Did Not Abuse Its Discretion in Declining to Require the State Farm Companies to Post Security for the Injunction. ........................................... 83

CONCLUSION ..................................................................... 85

CERTIFICATE OF COMPLIANCE .................................................. 86

CERTIFICATE OF SERVICE ...................................................... 87

iv

# TABLE OF AUTHORITIES

**CASES:**

*Aetna Cas. & Sur. Co. v. Liebowitz,*
 570 F. Supp. 908 (S.D.N.Y. 1983).............................................62

*Allstate Ins. Co. v. Harvey Family Chiropractic,*
 677 F. App'x 716 (2d Cir. 2017)........................................33-37

*Allstate Ins. Co. v. Lyons,*
 843 F. Supp. 2d 358 (E.D.N.Y. 2012)....................................56

*Allstate Ins. Co. v. Mun,*
 751 F.3d 94 (2d Cir. 2014) ................................... 14, 32, 53, 54

*Amalgamated Clothing Workers of Am. v. Richman Bros. Co.,*
 348 U.S. 511 (1972) .................................................................59

*Amalgamated Sugar Co. v. NL Indus., Inc.,*
 825 F.2d 634 (2d Cir. 1987) ....................................................81

*Am. Ins. Co. v. Lester,*
 214 F.2d 578 (4th Cir. 1954)...................................................79

*Armstrong v. Real Est. Int'l, Ltd.,*
 No. 05-cv-5383, 2006 WL 354983 (E.D.N.Y. Feb. 14, 2006) ......71

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs,*
 398 U.S. 281 (1970).............................................. 26, 76, 78, 79

*Atterberry v. State,*
 95 S.E.2d 787 (Ga. 1956).........................................................75

*Baumgarten v. Cnty. of Suffolk,*
 No. 07-cv-539, 2007 WL 1490482 (E.D.N.Y. May 15, 2007) ......71

*Bosch v. Lamattina,*
 No. 08-cv-238, 2008 WL 4820247 (E.D.N.Y. Nov. 4, 2008)........71

*Brenntag Int'l Chems., Inc. v. Bank of India,*
 175 F.3d 245 (2d Cir. 1999) ..............................................29, 37

v

*Capital Service, Inc. v. NLRB,*
  347 U.S. 501 (1954) ................................................... 76, 77, 82

*Cent. Rabbinical Cong. of U.S. & Can. v. New York City Dep't of
  Health & Mental Hygiene,* 763 F.3d 183 (2d Cir. 2014) ............. 47

*Charlotte Park & Recreation Comm'n v. Barringer,*
  88 S.E.2d 114 (N.C. 1955) ....................................................... 75

*Chevron Corp. v. Donziger,*
  833 F.3d 74 (2d Cir. 2016) ................................................ 61, 62

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities
  Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) ............................. 22, 42, 43, 46, 47

*Doctor's Assocs., Inc. v. Stuart,*
  85 F.3d 975 (2d Cir. 1996) ................................................ 27, 83

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,*
  755 F.2d 239 (2d Cir. 1985) ...................................................... 61

*Faiveley Transport Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009) .................................................... 29

*Gingras v. Think Fin., Inc.*
  922 F.3d 112 (2d Cir. 2019) .................................................... 62

*Gov't Emps. Ins. Co. v. Beynin,*
  No. 19-cv-6118, 2021 WL 1146051 (E.D.N.Y. Mar. 25,
  2021) ...................................................................................... 32

*Gov't Emps. Ins. Co. v. Cean,*
  No. 19-cv-2363, 2019 WL 6253804 (E.D.N.Y. Nov. 22,
  2019) ...................................................................................... 41

*Gov't Emps. Ins. Co. v. Landow,*
  No. 21-cv-1440, 2022 WL 939717 (E.D.N.Y. Mar. 29,
  2022) ...................................................................................... 47

*Gov't Emps. Ins. Co. v. Moshe,*
No. 20-cv-1098, 2020 WL 3503176 (E.D.N.Y. June 29, 2020) .................................................................................47

*Gov't Emps. Ins. Co. v. Relief Med., P.C.,*
554 F. Supp. 3d 482 (E.D.N.Y. 2021) ...........................................47

*Gov't Emps. Ins. Co. v. Strut,*
No. 19-cv-728, 2020 WL 1820500 (W.D.N.Y. Apr. 10, 2020) .................................................................................47

*Gov't Emps. Ins. Co. v. Wellmart RX, Inc.,*
435 F. Supp. 3d 443 (E.D.N.Y. 2020) ...........................................37

*Gov't Emps. Ins. Co. v. Zaitsev,*
No. 20-cv-3495, 2021 WL 3173171 (E.D.N.Y. July 27, 2021) .................................................................................47

*Gregg v. Georgia,*
428 U.S. 153 (1976) .................................................................66

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) .................................................................40

*Gucci Am., Inc. v. Weixing Li,*
768 F.3d 122 (2d Cir. 2014) .....................................................40

*Hamilton Watch Co. v. Benrus Watch Co.,*
206 F.2d 738 (2d Cir. 1953) ..............................................42, 51

*Hecht v. Commerce Clearing House, Inc.,*
897 F.2d 21 (2d Cir. 1990) ......................................................61

*Hilowitz v. Hilowitz,*
444 N.Y.S.2d 948 (N.Y. App. Div. 1981) ....................................33

*Houston v. Moore,*
18 U.S. (5 Wheat.) 1 (1820) .....................................................74

*Howsam v. Dean Witter Reynolds, Inc.,*
537 U.S. 79 (2002) ..................................................................55

vii

*Hyman v. Hodge,*
  9 V.I. 68 (V.I. Mun. Dec. 31, 1971) ..........................................75

*In re Am. Express Fin. Advisors Sec. Litig.,*
  672 F.3d 113 (2d Cir. 2011) ..............................................56, 57

*In re Baldwin-United Corp.,*
  770 F.2d 328 (2d Cir. 1985) ..................................27, 77, 81-83

*Jacobson v. Fireman's Fund Ins. Co.,*
  111 F.3d 261 (2d Cir. 1997) ...................................................33

*Jayaraj v. Scappini,*
  66 F.3d 36 (2d Cir. 1995) .......................................................34

*Judo, Inc. v. Peet,*
  326 N.Y.S.2d 441 (N.Y. Civ. Ct. 1971).................................74

*Krieger v. State,*
  283 N.Y.S.2d 86 (N.Y. Ct. Cl. 1966) ....................................75

*Marks v. United States,*
  430 U.S. 188 (1977)................................................................66

*Martinez v. California,*
  444 U.S. 277 (1980)..................................................70, 73, 75

*Maryland Comm. for Fair Representation v. Tawes,*
  180 A.2d 656 (Md. 1962).......................................................75

*Med. Soc'y of State v. Serio,*
  100 N.Y.2d 854 (2003) ...........................................................13

*Metro. Taxicab Bd. of Trade v. City of New York,*
  615 F.3d 152 (2d Cir. 2010) .......................................28, 42, 47

*Migra v. Warren City Sch. Dist. Bd. of Educ.,*
  465 U.S. 75 (1984).................................................................33

*Mitchum v. Foster,*
  407 U.S. 225 (1972).............. 3, 4, 7, 11, 23-25, 59-64, 66, 68-75

*Motorola Credit Corp. v. Uzan,*
   202 F. Supp. 2d 239 (S.D.N.Y. 2002) ........................................62

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................52

*Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Loc.*
   *2-286 v. Amoco Oil Co. (Salt Lake City Refinery),*
   885 F.2d 697 (10th Cir. 1989) ..................................................51

*Perl v. Meher,*
   18 N.Y.3d 208 (2011) ..............................................................14

*Pommells v. Perez,*
   4 N.Y.3d 566 (2005) ................................................................14

*Poole v. Allstate Ins. Co.,*
   20 A.D.3d 518 (N.Y. 2d Dep't 2005) ........................................32

*Radiology Res. Network, P.C. v. Fireman's Fund Ins. Co.,*
   12 A.D.3d 185 (N.Y. 1st Dep't 2004) ........................................31

*Really Good Stuff, LLC v. BAP Invs., L.C.,*
   813 F. App'x 39 (2d Cir. 2020) ................................................51

*Republic of the Philippines v. Marcos,*
   862 F.2d 1355 (9th Cir. 1988) ..................................................40

*Republic of Philippines v. New York Land Co.,*
   852 F.2d 33 (2d Cir. 1988) ......................................................42

*Reuters Ltd. v. United Press Int'l, Inc.,*
   903 F.2d 904 (2d Cir. 1990) ....................................................28

*Richardson v. Thompson,*
   390 S.W.2d 830 (Tex. Civ. App. 1965) ................................74, 75

*Schneider v. Ohio Youth Comm'n,*
   287 N.E.2d 633 (Ohio Ct. App. 1972) ......................................74

*Shalala v. Ill. Council on Long Term Care, Inc.,*
   529 U.S. 1 (2000) ....................................................................72

*Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863 (1st Cir. 1981) ........................57

*St. Paul Fire & Marine Ins. Co. v. Lack,* 443 F.2d 404 (4th Cir. 1971)...................................................79

*State Farm Mut. Auto. Ins. Co. v. Parisien,* 352 F. Supp. 3d 215 (E.D.N.Y. 2018)................................31, 54

*State Farm Mut. Auto. Ins. Co v. Rabiner,* 749 F. Supp. 2d 94 (E.D.N.Y. 2010) .........................................13

*Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574 (1960)..................................................................55

*Stephens v. Allstate Ins. Co.,* 185 A.D.2d 338 (N.Y. 2d Dep't 1992)..................................31, 32

*Tafflin v. Levitt,* 493 U.S. 455 (1990)..................................................................74

*Trump v. Deutsche Bank AG,* 943 F.3d 627 (2d Cir. 2019) .................................................46

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643 (2d Cir. 2011) .................................................55

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 995 F.2d 375 (2d Cir. 1993) ...................38

*United States v. Ramirez,* 297 F.3d 185 (2d Cir. 2002) .................................................84

*Urban Radiology, P.C. v. GEICO Ins. Co.,* No. 141235/2008, 28 Misc. 3d 1230(A), 2010 WL 3463018 (N.Y. Civ. Ct., Kings Cty. 2010) ................................31

*Vendo Co. v. Lektro-Vend Corp.* 433 U.S. 623 (1977).......................................25, 64-66, 69-72

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989) .....................................................55

*Wholesale Elec. & Supply, Inc. v. Robusky,*
   258 N.E.2d 432 (Ohio 1970)......................................................74

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)......................................................................51

*Wyly v. Weiss,*
   697 F.3d 131 (2d Cir. 2012) ......................................................80

*Yang v. Kosinski,*
   960 F.3d 119 (2d Cir. 2020) ......................................................51

*Zervos v. Verizon New York, Inc.,*
   252 F.3d 163 (2d Cir. 2001) ......................................................27

*Zwickler v. Koota,*
   389 U.S. 241 (1967)..................................................................74

**STATUTES**

9 U.S.C. § 1, *et seq.*..............................................................................3

9 U.S.C. § 2 ......................................................................................23, 55

15 U.S.C. § 26 ......................................................................................65

18 U.S.C. § 1962(c) ...............................................................................9

18 U.S.C. § 1962(d)................................................................................9

18 U.S.C. § 1964(a) ............................... 3, 7, 24, 38, 58, 60-63, 68

28 U.S.C. § 1292(a)(1) ..........................................................................5

28 U.S.C. § 1331.....................................................................................5

28 U.S.C. § 1332(a)(1) ..........................................................................5

28 U.S.C. § 1367.....................................................................................5

28 U.S.C. § 2283..................2, 3, 4, 7, 8, 10, 58, 59, 63, 76, 81, 83

42 U.S.C. § 1983................................ 11, 24, 25, 60-64, 70, 73-75

N.Y. Educ. Law § 6530 ....................................................................14

N.Y. Ins. Law § 5101, *et seq.* ....................................................1, 12

N.Y. Ins. Law § 5102 ................................................................ 13, 14

N.Y. Ins. Law § 5106(a) ..................................................................14

N.Y. Ins. Law § 5106(b) ........................................... 14, 23, 55, 56

N.Y. Ins. Law § 5108 ......................................................................13

N.Y. Pub. Health Law §§ 238-a ....................................................14

N.Y. Pub. Health Law §§ 238-d ....................................................14

**RULES**

Fed. R. App. P. 4(a) ..........................................................................6

Fed. R. Civ. P. 65(c) ..................................................................83, 84

**REGULATIONS**

8 N.Y.C.R.R. § 29.1(b) ....................................................................14

10 N.Y.C.R.R. § 34-1.3 ....................................................................14

11 N.Y.C.R.R. pt. 65.........................................................................12

65 N.Y.C.R.R. § 65-3.11(a) .............................................................13

11 N.Y.C.R.R. § 65-3.16 ..................................................................13

**OTHER AUTHORITIES**

116 Cong. Rec. (daily ed. Jan. 21, 1970), *available at*
https://tinyurl.com/mu8n4yjd ........................................67, 68

17A Charles Alan Wright, *et al.*, Federal Practice &
Procedure § 4224 (3d ed. 2007) ...............................................66

Br. for Plaintiffs-Appellants, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. July 13, 2016), *available at* 2016 WL 3855272 ....................................34

Br. for Defendants-Appellees, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. Sept. 19, 2016), *available at* 2016 WL 5118452 ....................................35

*The Challenge of Crime in a Free Society: A Report by the President's Commission on Law Enforcement and Administration of Justice* 191 (1967), *available at* https://tinyurl.com/mwkbvx9c) .............................................67

*In That,* Merriam-Webster Dictionary, tinyurl.com/yzj3c7ae ........................................................72

N.Y. State Dep't of Fin. Servs., *Investigating and Combating Health Insurance Fraud* (Mar. 15, 2018) .................54

Reply Br. for Plaintiffs-Appellants, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. Oct. 7, 2016), *available at* 2016 WL 5929097 ...........................35, 36

*Task Force Report: Organized Crime: Annotations and Consultants' Papers* (1967), *available at* https://tinyurl.com/3rm7zjmh) ............................................67

## INTRODUCTION

This case involves Defendants' use of New York's no-fault system—including the state courts themselves—to further a massive fraud against State Farm Mutual Automobile Insurance Co. and State Farm Fire and Casualty Co. (collectively, the State Farm Companies). Defendants—various medical providers, individuals, and affiliated corporations—abuse New York's no-fault insurance statute, N.Y. Ins. Law § 5101, *et seq.*, to collect insurance benefits to which they are not entitled. The fraud, however, is not readily apparent when viewed on a claim-by-claim basis. Rather, it involves the use of a predetermined treatment protocol that is apparent only when all of the fraudulent claims are viewed together. All told, Defendants have attempted to monetize their fraud by filing over 2,450 arbitrations and 480 state-court lawsuits against the State Farm Companies, seeking payment for fraudulent bills, including those underlying this action.

After the pattern of fraud became apparent, the State Farm Companies filed a lawsuit asserting federal claims against Defendants under the Racketeering Influenced and Corrupt Organizations Act (RICO), and related fraud and unjust enrichment

1

claims under New York common law. The State Farm Companies also moved for a preliminary injunction to enjoin Defendants from filing additional arbitrations and state-court lawsuits, and to stay some 1,569 arbitrations and 215 state-court actions then pending, which Defendants were using to collect on their fraud.

The U.S. District Court for the Eastern District of New York (Brodie, C.J.) granted the preliminary injunction in part. The Court enjoined Defendants from filing future arbitrations and state-court lawsuits and stayed the pending arbitrations. At the same time, the District Court held the Anti-Injunction Act, 28 U.S.C. § 2283, prevented it from staying pending state-court lawsuits. Some of the Defendants appealed the portion of the order granting the preliminary injunction, and the State Farm Companies have cross-appealed the portion of the order declining to preliminarily enjoin the pending state no-fault actions under the Anti-Injunction Act.

As to Defendants' appeal, the District Court did not abuse its discretion in issuing the preliminary injunction. The Court correctly found the traditional factors governing preliminary injunctive relief were satisfied. In particular, the Court correctly found the State Farm Companies would be irreparably harmed because, absent an

2

injunction, no forum would be able to fully adjudicate their fraud claims. The district court also correctly held the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), did not prevent the court from enjoining the arbitrations because the FAA applies only to privately negotiated *contracts*—not arbitrations mandated by statute such as New York's no-fault law.

As to the cross-appeal, the District Court erred in holding neither of two exceptions to the Anti-Injunction Act applies. Either exception would have allowed the Court to enjoin the pending state no-fault lawsuits.

As an initial matter, the State Farm Companies' RICO claims satisfy an exception to the Anti-Injunction Act, because a stay of state-court litigation is "expressly authorized by [that] Act of Congress." 28 U.S.C. § 2283. Indeed, under RICO, the District Court is expressly authorized to "prevent and restrain violations" of that statute, 18 U.S.C. § 1964(a), and Defendants are using their state no-fault actions to further their racketeering enterprise. As explained below, RICO satisfies the test laid down in *Mitchum v. Foster*, 407 U.S. 225 (1972), for satisfying this exception to the Anti-Injunction Act. In reaching a contrary result, the District Court ignored the

3

outcome of *Mitchum* and gave controlling weight to a non-binding, plurality opinion that did not—and could not—modify the test established in *Mitchum.*

In addition, enjoining the pending state no-fault actions satisfies a second exception to the Anti-Injunction Act, because such an injunction is "necessary in aid of [the district court's] jurisdiction." 28 U.S.C. § 2283. As explained below, absent an injunction, no forum will be able to adequately litigate the State Farm Companies' claims of fraud because Defendants' fraud is not apparent when viewed on a claim-by-claim basis, and that's all state courts resolve in any given no-fault action—a single claim. As a result, state courts are incapable of seeing the mosaic of Defendants' fraud, but their judgments potentially risk an eroding *res judicata* effect that may prevent any court from adequately addressing the State Farm Companies' claims. As a result, an injunction is necessary in aid of the District Court's jurisdiction to ensure there is a court available to adjudicate the State Farm Companies' claims.

Accordingly, this Court should affirm the portion of the District Court's order granting the preliminary injunction as to pending and future arbitrations, and future state-court litigation, and reverse the

4

portion of the District Court's order declining to enjoin pending state-court litigation.

## **STATEMENT OF JURISDICTION**

Because the State Farm Companies' claims were premised on RICO and New York law, the District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. A-159-201 (First Amended Complaint ("FAC") ¶¶ 338-484). The District Court also had jurisdiction over the State Farm companies' claims pursuant to 28 U.S.C. § 1332(a)(1) because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. A-58-72 (FAC ¶¶ 25-91).

Under 28 U.S.C. § 1292(a)(1), this Court has jurisdiction to adjudicate the State Farm Companies' cross-appeal from the District Court's order denying in part their request for a preliminary injunction, and the District Court's order denying the State Farm Companies' motion for reconsideration of that order. The State Farm Companies' notice of cross-appeal is timely because it was filed within 14 days of the first notice of appeal filed by Defendants, which in turn was filed within 30 days of the entry of the District Court's order granting and denying in part the motion for preliminary

5

injunction. *See* Fed. R. App. P. 4(a)(1)(A), (a)(3); *see also* A-518-21 (notice of cross-appeal filed June 29, 2022); A-509-10 (first notice of appeal filed June 15, 2022 by Defendants Metro Pain Specialists P.C., Tri-Borough NY Medical Practice, P.C., and Leonid Shapiro, M.D.); SPA-1-53 (memorandum & order on preliminary injunction, entered May 20, 2022). Further, the State Farm Companies filed a timely amended notice of cross-appeal within 30 days of the entry of the District Court's order denying the State Farm Companies' motion for reconsideration. *See* Fed. R. App. P. 4(a)(1)(A), (a)(4); *compare* A-524-26 (amended notice of cross-appeal filed August 10, 2022), *with* SPA-54-64 (memorandum & order on motion for reconsideration entered August 1, 2022).

## STATEMENT OF THE ISSUES

1.  On Defendants' appeal, whether the district court acted within its discretion by preliminarily enjoining Defendants from prosecuting pending and future no-fault arbitrations, and from bringing any new no-fault lawsuits in state court, where: (i) the prosecution of those no-fault actions could effectively prevent the State Farm Companies from proving in any forum that Defendants are committing insurance fraud, (ii) the State Farm Companies have

6

alleged a complex fraud in great detail, based on a rigorous pre-suit investigation, including documentary support; (iii) Defendants are using the no-fault lawsuits and arbitrations to obscure the fraud, and collect on their fraudulent scheme; and (iv) an injunction is necessary to vindicate the important interest of restraining and preventing fraud and abuse of New York's no-fault insurance system.

2. On Defendants' appeal, whether the district court properly held the Federal Arbitration Act poses no barrier to enjoining no-fault arbitrations where the arbitration requirement at issue is not the result of a bargained-for contract, but rather, is mandated by New York law.

3(a). On the cross-appeal, whether an injunction of pending state-court lawsuits is "expressly authorized by [an] Act of Congress," 28 U.S.C. § 2283, where civil RICO is a unique federal remedy that expressly authorizes courts to "prevent and restrain violations" of RICO, 18 U.S.C. § 1964(a), and this provision could be "given its intended scope only by the stay" of a multiplicity of state-court proceedings meant to further Defendants' racketeering activities, *Mitchum,* 407 U.S. at 238.

3(b).     On the cross-appeal, whether an injunction of pending state-court lawsuits was "necessary in aid of [the court's] jurisdiction," 28 U.S.C. § 2283, where the State Farm Companies' claims are not susceptible to adjudication in the pending, individual state-court suits, those suits are a component of the fraudulent scheme at issue in the federal action, and as those state-court suits are adjudicated, there is a risk they may have preclusive effect in the State Farm Companies' federal action, thereby impairing the District Court's flexibility and authority to decide the case before it.

4.     On Defendants' appeal, whether the district court properly exercised its discretion in declining to require the State Farm Companies to post a bond, where it is undisputed the State Farm Companies would be able to pay any damages in the event the preliminary injunction was wrongly issued.

## STATEMENT OF THE CASE

### A.     The District Court Proceedings.

This case arises out of Defendants' operation of a fraudulent insurance scheme, through which Defendants have defrauded the State Farm Companies out of more than $15.4 million. A-57 (FAC ¶ 21). Upon discovering Defendants' scheme, the State Farm

8

Companies brought this lawsuit in the Eastern District of New York, alleging common law fraud, unjust enrichment, and violations of RICO, 18 U.S.C. § 1962(c)-(d). A-159-201 (FAC ¶¶ 338-484). The operative First Amended Complaint seeks damages for benefits fraudulently claimed by Defendants and paid by the State Farm Companies, and a declaration that Defendants are not entitled to payment for unpaid claims for services that have been or will be rendered by Defendants through the end of the litigation.[1] *Id.*

As part of their scheme, Defendants routinely file lawsuits in state court, or demand arbitration, when one of the State Farm Companies denies or does not otherwise pay Defendants' fraudulent bills. At the time the State Farm Companies moved for a preliminary injunction in the District Court, Defendants had filed over 2,450 arbitrations and approximately 480 state-court lawsuits. A-255. Of those arbitrations and lawsuits, 1,569 arbitrations and 215 lawsuits were pending. *Id.*; A-258-301. The State Farm Companies' motion

---

[1] On January 9, 2023, the State Farm Companies sought leave in the District Court to file a Second Amended Complaint to add additional defendants and information about the fraudulent scheme. They also moved for a temporary restraining order against the additional defendants and modification of the preliminary injunction to enjoin the new defendants. Those motions are currently pending.

requested the District Court to preliminarily enjoin pending and future state-court lawsuits and arbitrations until completion of the federal action. *See* Dist. Ct. Dkt. 80 at 31.[2]

The District Court (Brodie, C.J.) granted the requested preliminary relief in part and denied it in part. *See* SPA-1-53. In a factually detailed order, the Court held the standard for granting preliminary injunctive relief had been satisfied. SPA-33-50. Thus, the Court enjoined Defendants from bringing future no-fault collection arbitrations or lawsuits. SPA-53. The Court also stayed the pending no-fault collection arbitrations, but it declined to stay the pending state-court lawsuits. *Id.*

As to the pending state-court lawsuits, the District Court reasoned the Anti-Injunction Act, 28 U.S.C. § 2283, deprived the Court of authority to enjoin the pending suits. SPA-32. The Court rejected the State Farm Companies' argument that an injunction is "expressly authorized by [an] Act of Congress," 28 U.S.C. § 2283, based on the Court's belief the "expressly authorized" exception applies only to statutes over which federal courts have exclusive

---

[2] Cited pages of a memorandum of law or other briefing in the District Court refer to page numbers assigned by the CM/ECF filing system.

jurisdiction. SPA-31. The District Court also rejected the argument that an injunction was "necessary in aid of its jurisdiction"—even though the District Court found allowing the state lawsuits to proceed would impair the Court's jurisdiction. SPA-22-23.

The State Farm Companies moved for reconsideration as to the "expressly authorized" exception. They explained the exception cannot be limited to statutes over which federal courts have exclusive jurisdiction given the Supreme Court's holding that 42 U.S.C. § 1983 satisfies the "expressly authorized" exception, because state and federal courts have concurrent jurisdiction over § 1983. *See* Dist. Ct. Dkt. 241 at 6-7 (discussing *Mitchum v. Foster*, 407 U.S. 225 (1972)). The District Court denied the motion. SPA-64.

Two groups of Defendants appealed the Court's order to the extent it granted a preliminary injunction and stay: (1) Metro Pain Specialists P.C. ("Metro Pain"), Tri-Borough NY Medical Practice P.C. ("Tri-Borough"), and Leonid Shapiro, M.D. (collectively, the "Metro Pain Defendants"); and (2) Reuven Alon aka Rob Alon, Columbus Imaging Center LLC, Medaid Radiology LLC, Yan Moshe aka Yan Leviev, Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center LLC, and Integrated Specialty ASC LLC (collectively, the "Alon

11

Defendants"). A-509-17. The Metro Pain Defendants and Alon Defendants—and in particular, Dr. Leonid Shapiro, Reuven Alon, and Yan Moshe—are the key architects and central figures of the alleged scheme. *E.g.*, A-47-48 (FAC ¶ 2).

The State Farm Companies cross-appealed insofar as the District Court declined to stay Defendants' no-fault actions pending in state court. A-518-21. Following the District Court's denial of the State Farm Companies' motion for reconsideration (SPA-54-64), the State Farm Companies filed an amended notice of their cross-appeal, to include the District Court's denial of the motion for reconsideration (A-524-26).

### B. Defendants' Fraudulent Scheme.

#### 1. Defendants' Fraud Is Predicated on Exploiting New York's No-Fault Laws.

Defendants' fraud exploits New York's no-fault laws—officially, the Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101-5109, and related regulations, 11 N.Y.C.R.R. pt. 65. The purpose of the no-fault system is threefold: "to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to

12

provide substantial premium savings to New York motorists." *Med. Soc'y of State v. Serio*, 100 N.Y.2d 854, 860 (2003). Thus, New York's no-fault laws instituted "a system of no-fault insurance that supplanted common-law tort actions for most victims of automobile accidents." *State Farm Mut. Auto. Ins. Co v. Rabiner*, 749 F. Supp. 2d 94, 98 (E.D.N.Y. 2010).

For legitimate claims made in compliance with New York law, the insured party is permitted to recover up to $50,000 from insurers for "'basic economic loss,' including medical expenses, that arise out of the use or operation of an insured vehicle." *Rabiner*, 749 F. Supp. 2d at 99 (citing N.Y. Ins. Law § 5102); *see also* A-72-73 (FAC ¶¶ 93-94).

Insureds may assign their benefits to "providers of health care services," who can then submit claims directly to insurers for medical services. N.Y.C.R.R. § 65-3.11(a); A-73 (FAC ¶ 95). "Medical expenses are reimbursed based upon a fee schedule which specifies the charges permitted for specific services rendered by particular kinds of providers." *Rabiner*, 749 F. Supp. 2d at 99 (citing N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. § 65-3.16); *see also* A-73 (FAC ¶ 96). Ordinarily, insurers are required to verify a claim, and then pay or

13

deny it within thirty days. N.Y. Ins. Law § 5106(a). In the event of a "dispute involving the insurer's liability to pay first party benefits," the no-fault laws "provide [the] claimant with the option of submitting" the dispute to arbitration. *Id.* § 5106(b). Such arbitrations are held pursuant to "simplified procedures." *Id.*

A provider of health services is not eligible for reimbursement under § 5102(a)(1) in a number of circumstances, including if the medical services or goods provided were not medically necessary or were provided pursuant to unlawful referrals or kickbacks. *See* N.Y. Pub. Health Law §§ 238-a, 238-d; 10 N.Y.C.R.R. § 34-1.3; N.Y. Educ. Law § 6530(17)-(19); 8 N.Y.C.R.R. § 29.1(b)(2)-(4). Although the no-fault system promotes efficiency, it also has its downsides—"[a]buse . . . abounds." *Perl v. Meher,* 18 N.Y.3d 208, 214 (2011) (quoting *Pommells v. Perez,* 4 N.Y.3d 566, 571 (2005)). For this reason, this Court has recognized lawsuits like the instant suit are necessary to ferret out the fraud that plagues New York's no-fault system. *Allstate Ins. Co. v. Mun,* 751 F.3d 94, 100 (2d Cir. 2014).

### 2. Defendants Submit Fraudulent Bills for Medically Unnecessary Services Rendered Pursuant to a Predetermined Treatment Protocol and Unlawful Referrals and Kickbacks.

This case is an archetype of fraud perpetrated under the no-fault laws. Defendants are a group of health care providers, related individuals, and entities who purport to treat car accident victims. Defendants include two physicians, a number of physical therapists, chiropractors, and acupuncturists, along with related professional corporations, radiology centers, and ambulatory surgery centers. A-59-72 (FAC ¶¶ 27-91). Defendants devised a scheme to submit bills and supporting documentation for examinations, treatment, testing, injections, durable medical equipment, and other services provided to individuals who were purportedly involved in car accidents and eligible for no-fault benefits under the State Farm Companies' insurance policies. *E.g.*, A-47-57 (FAC ¶¶ 1-21). But Defendants' claims for insurance benefits were fraudulent because, in all circumstances, the services were not medically necessary, were provided pursuant to unlawful referrals, kickbacks, or "pay to play" arrangements, or were otherwise not eligible for reimbursement. *See generally* A-45-203 (FAC).

15

One way Defendants perpetuated their fraud was through a predetermined treatment protocol designed to maximize the medical bills submitted to the State Farm Companies, and exploit patients' no-fault benefits. As a first step, patients would undergo an initial examination, which would report substantially similar if not identical findings for virtually every patient, as a pretext to justify unnecessary treatment and services. A-51 (FAC ¶ 9). Then, virtually all patients were referred for the same additional services—physical therapy, chiropractic care, acupuncture, diagnostic tests, medical supplies, and prescription gels and patches—regardless of patient need, and in such a way as to maximize the amount that could be claimed under the fee schedule governing no-fault claims. *E.g.*, A-51-56 (FAC ¶¶ 10-18). Patients also underwent medically unnecessary pain management and orthopedic consultations followed by procedures performed at ambulatory surgery centers. A-52 (FAC ¶ 13).

Initially, Metro Pain—purportedly owned by Dr. Leonid Shapiro—acted as a "gatekeeper" to the scheme. That is, Metro Pain operated the clinics that performed the predetermined patient examinations, and then referred those patients for additional services performed by Metro Pain and other providers in exchange for

16

kickbacks and "pay to play" financial relationships. A-51 (FAC ¶ 9).

Beginning in May 2021, Tri-Borough—also purportedly owned by Dr.

Shapiro—was formed to replace Metro Pain's role in the scheme.

A-53, 96-97 (FAC ¶¶ 14, 153-155). Tri-Borough was formed at least

in part to induce the State Farm Companies to remit payment for

services they would not have paid on Metro Pain patients, after

learning claims involving Metro Pain's patients were fraudulent. A-

97, 151 (FAC ¶¶ 154, 309).[3]

The District Court identified several examples of patient

treatment evidencing Defendants' fraud:

- "Nearly every patient is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot and cold packs, electronic muscle stimulation, and either therapeutic massage or manual therapy";

- "[A]lthough [various Chiropractor Defendants] treat patients at different locations . . . , their [c]hiropractic [i]nitial [r]eports include the identical boilerplate treatment plan";

- "Patients receive the same acupuncture treatment regardless of their condition or complaints. On virtually every visit, charges

---

[3] Metro Pain inaccurately claims, "State Farm has succeeded in putting Metro Pain out of business by delaying payments to it." Metro Pain Op. Br. 23. In reality, Metro Pain has reconstituted itself as Tri-Borough, in an attempt to obscure the fraud by submitting fraudulent claims under a different name. A-97, 151 (FAC ¶¶ 154, 309).

17

include two units of acupuncture, plus codes reflecting cupping";

- "The MRI Defendants perform MRIs on at least two regions for virtually every patient. Regardless of the MRI findings, Defendants' treatment of patients does not change. After receiving MRIs, patients continue with the same Predetermined Treatment Protocol in place before the MRIs were ordered";

- "[P]atients typically receive five or more Supplies, with some patients prescribed as many as [twenty-one] Supplies. Many patients receive at least one cervical collar and one [lumbar support], along with the other items. It is improbable so many patients would need so many Supplies and would need the same types of Supplies."

SPA-39 n.16 (quoting FAC ¶¶ 202, 211, 220, 232, 247-48).

As the District Court also noted, the State Farm Companies "submitted twenty-two exhibits that include examples of service and product prescriptions, referral and order forms, and lists of each and every claim—including date of visit, patient ID, prescriptions, and amount billed—where medically unnecessary examinations, treatments, MRIs, Supplies, and tests were allegedly performed as a part of the kickbacks and pay to play arrangements." *Id.*

As part of their fraud, Defendants ultimately submit documents to the State Farm Companies falsely representing the services and supplies purportedly provided were medically necessary and otherwise eligible for reimbursement.

18

### 3. Defendants Use Arbitrations and State-Court Litigation to Further Their Fraudulent Scheme.

As a final step in the scheme, if one of the State Farm Companies denied or otherwise did not pay Defendants' bills (which sometimes exceed the maximum amount allowed by the no-fault fee schedule), Defendants would routinely file lawsuits or demand arbitration—with an amount ranging from a few hundred to a few thousand dollars. A-254-301.

The thousands of fraudulent, meritless, and burdensome lawsuits and arbitrations filed by Defendants further the scheme in two ways. First, by taking advantage of New York's streamlined no-fault insurance system, they are a mechanism through which Defendants monetize their fraud. Second, Defendants use these lawsuits and arbitrations to obscure their fraud. The no-fault proceedings are filed in a manner intended to prevent the State Farm Companies from presenting and proving the fraudulent nature of the claims. Specifically, Defendants file piecemeal litigation, often over a single bill for a single date of service, thereby precluding evidence, in each individual proceeding, of the patterns across multiple claims. *See* A-258-301. Further, the numerous individual proceedings

impose unquantifiable additional burdens on the State Farm Companies, to discourage careful consideration of, and challenges to, the conduct. Thus, in an individual state-court action, the fraud is effectively obscured.

In short, Defendants are abusing the no-fault system, and the courts themselves, to perpetuate their fraud, burdening all parties and the courts with meritless and disparate litigation. And Defendants' use of piecemeal litigation not only furthers the fraud, but also helps insulate the fraud from detection.

## **SUMMARY OF THE ARGUMENT**

I.      As to Defendants' appeal, the District Court did not abuse its discretion in deeming each of the preliminary-injunction factors satisfied.

A.      The first factor is irreparable harm, which the State Farm Companies have demonstrated in multiple ways.

1.      Absent an injunction, there is a real risk the State Farm Companies will be denied an adequate forum to litigate their claims of fraud. In the thousands of individual no-fault lawsuits and arbitrations, Defendants' fraud is not apparent because the puzzle of the fraud is revealed only when many claims are viewed collectively.

20

But the no-fault lawsuits and arbitrations are focused on only a single claim—a single puzzle piece. In addition, as to the federal suit, it might be argued the arbitration and state-court decisions have a creeping *res judicata* effect, which could deny the State Farm Companies complete relief in the federal forum as well.

2.　　Irreparable harm is present in three additional ways. *First*, without an injunction, Defendants would be permitted to continue using no-fault actions to monetize their fraud, and thus finance their fraudulent practices with proceeds paid by the State Farm Companies. *Second*, continuation of the state-court suits and arbitrations will allow Defendants to dissipate assets, denying the State Farm Companies a remedy in this case. Each no-fault action that reaches judgment reduces the District Court's ability to declare the State Farm Companies do not owe coverage for that claim. In addition, there is a heightened risk Defendants will be judgment proof at the conclusion of this action. *Third*, the time and resources required to respond to thousands of no-fault actions is designed to discourage careful consideration of, and challenges to, Defendants' conduct.

21

B. There are sufficiently serious questions going to the merits to make them fair grounds for litigation. The State Farm Companies have provided detailed allegations and exhibits explaining Defendants' fraudulent treatment and billing scheme. This is enough to satisfy the "serious questions" standard, which provides needed flexibility "in the face of . . . the greater uncertainties inherent at the outset of particularly complex litigation" like this case. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)

C. The balance of equities decidedly favors a preliminary injunction. Absent an injunction, there is a serious risk the State Farm Companies will be unable to prove the full scope of Defendants' fraud in any court, and the harms to the no-fault system will continue. In contrast, a preliminary injunction will not harm Defendants because they will still be able to fully litigate their claims for recovery of no-fault benefits.

D. The public interest supports a preliminary injunction because an injunction would prevent abuse of the no-fault system. Also, the public interest will be well served by the efficiency of resolving the issues in a single proceeding.

22

II.    As to Defendants' appeal, the FAA does not bar a preliminary injunction of future or pending arbitrations. The FAA applies only to privately negotiated "contract[s]," 9 U.S.C. § 2, but the arbitrations in this case are mandated by New York's no-fault law, *see* N.Y. Ins. Law § 5106(b). The FAA does not apply in these circumstances.

III.    As to the State Farm Companies' cross-appeal, the Anti-Injunction Act does not bar an injunction of Defendants' pending state-court actions because two exceptions to the Anti-Injunction Act apply.

A.    First, an injunction is expressly authorized by an act of Congress—that is, RICO. This exception simply requires that "an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Mitchum*, 407 U.S. at 238.

1.    *Mitchum's* reference to a unique "federal right or remedy" requires only that a federal statute create a remedy that did not exist at common law. *See id.* at 240. RICO did just that: it was enacted to provide a federal remedy for wrongs states otherwise did not have a mechanism to redress. Further, the uniquely federal right and

23

remedy created by RICO is "enforceable in a federal court of equity." *Id.* at 238. Federal district courts have broad equitable powers, and RICO explicitly authorizes private parties to obtain equitable relief to "prevent and restrain violations" of that statute. 18 U.S.C. § 1964(a).

2.  RICO can be "given its intended scope only by the stay of [the] state court proceeding[s]." *Mitchum,* 407 U.S. at 238. An injunction here is supported by the facts of *Mitchum* itself, where the Supreme Court extended the "expressly authorized" exception to 42 U.S.C. § 1983 because "state courts [had been] used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." *Id.* at 240. Here, Defendants are using a pattern of baseless state no-fault proceedings to monetize and perpetuate their violations of RICO—to harass and injure the State Farm Companies. And because of the fragmented nature of Defendants' no-fault proceedings, the "state courts [are] powerless to stop [the] deprivations." *Id.*

Moreover, though there is no evidence here that state courts might be "in league with those who were bent upon the abrogation of federally protected rights," that concern animated the Congress that

24

enacted RICO, and further supports the notion that RICO was intended to satisfy the "expressly authorized" exception to the Anti-Injunction Act. *See id.*

What's more, under circumstances similar to those here, a majority of the justices in *Vendo Co. v. Lektro-Vend Corp.* recognized that where a federal statute authorizes an injunction, and where a litigant files a multiplicity of state-court cases in violation of that statute, the "expressly authorized" exception is satisfied. 433 U.S. 623 (1977).

3.   The District Court held the "expressly authorized" exception did not apply based on its erroneous belief that, for a federal statute to create a uniquely federal right or remedy, it must create a right enforceable only in federal court. This holding is contrary to *Mitchum,* where the Supreme Court held Section 1983—a statute *not* subject to the exclusive jurisdiction of federal courts—satisfies the "expressly authorized" exception. *Mitchum,* 407 U.S. at 243. Further, in reaching its decision, the District Court misinterpreted a plurality opinion in *Vendo,* and how it related to the Supreme Court's earlier decision in *Mitchum.*

B.    A second exception to the Anti-Injunction Act also applies. An injunction is necessary in aid of the District Court's jurisdiction because, without one, the State-court proceedings will seriously threaten the District Court's "flexibility and authority to decide [the] case." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970).

Defendants have filed hundreds of state-court actions. Those actions' piecemeal nature renders it practically impossible to prove Defendants' global fraud in each individual action. Moreover, the filing of multiple suits is an element of the fraudulent scheme that this federal action was filed to redress.

Given the foregoing, the District Court is the only court capable of fully adjudicating the State Farm Companies' claims. But given the risk the state-court actions might be deemed to have preclusive effect on the federal action, the District Court may be denied this opportunity if the state-court suits are allowed to continue. Thus, left unchecked, the state-court litigation threatens to "hinder the federal court's jurisdiction so as to make an injunction necessary to aid that jurisdiction." *Atl. Coast Line*, 398 U.S. at 296.

26

IV.    As to Defendants' appeal, the district court did not abuse its discretion in declining to require the State Farm Companies to post security for the injunction. The district court has broad discretion to decline to order security. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). There is no risk the State Farm Companies will be unable to pay Defendants for any damages in the event the injunction was wrongly issued.

## STANDARD OF REVIEW

"[A] district court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 166 (2d Cir. 2001). "An abuse of discretion may be found when the district court relies on clearly erroneous findings of fact or on an error of law in issuing the injunction." *In re Baldwin-United Corp.*, 770 F.2d 328, 334 (2d Cir. 1985). This Court reviews *de novo* the district court's interpretation of the Anti-Injunction Act, whereas it reviews any underlying findings of fact for clear error, and it must defer to the District Court's grant of the preliminary injunction unless it lies outside the range of discretion accorded the District Court. *Id.*

27

## ARGUMENT

**I.    As to Defendants' Appeal, the District Court Did Not Abuse Its Discretion in Preliminarily Enjoining Future and Pending Arbitrations, and Future State-Court Litigation.**

To obtain a preliminary injunction, the moving party must "demonstrate 1) irreparable harm absent injunctive relief; 2) 'either a likelihood of success on the merits, or a serious question going to the merits to make [it] a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor,' and 3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

The District Court held each of these factors was satisfied, and enjoined future and pending no-fault arbitrations, and future state-court litigation. The District Court did not abuse its discretion in doing so.

**A.    Because the State Farm Companies' Claims Are Not Susceptible to Litigation in Defendants' Individual No-Fault Actions, the State Farm Companies Would Be Irreparably Harmed Absent the Injunction.**

Irreparable harm is "imminent, not remote or speculative," and "incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). It occurs "where, but for the grant of equitable relief, there is a

28

substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir. 1999); *see also Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009).

The State Farm Companies have demonstrated that absent injunctive relief, they would suffer multiple irreparable injuries that could not be remedied at the end of trial.

**1.    Absent an Injunction, the State Farm Companies Risk Being Unable to Fully Vindicate Their Fraud Claims In Any Forum.**

Most critically, absent an injunction, there is a real risk the State Farm Companies will be denied their day in court. That is, absent an injunction, neither the no-fault lawsuits and arbitration proceedings nor this federal action will provide an adequate forum for the State Farm Companies to litigate their claims of fraud.

As to state-court actions and arbitrations, those proceedings are often premised on a single bill. But the fraud is global and becomes apparent only when many claims are viewed in the aggregate. For example, the State Farm Companies allege Metro Pain and Tri-Borough apply predetermined treatment to patients to justify

29

additional treatment and services. A-51 (FAC ¶ 9). Patients are virtually always prescribed a treatment plan consisting of a combination of physical therapy, chiropractic care, and acupuncture. A-51 (FAC ¶ 10). In addition, virtually every patient who receives more than one office visit is referred for MRIs on at least two regions of the body and prescribed cervical collars and/or lumbar orthoses. A-51-52 (FAC ¶ 11).

Although a single bill for a single patient's MRI might appear to be legitimate and medically necessary on its own, that bill begins to appear fraudulent when it is revealed that Metro Pain and Tri-Borough patients are receiving MRIs as a matter of course. Indeed, the exhibits to the complaint compile the treatment patterns across patients, and visually demonstrate how the fraud becomes apparent when Defendants' claims for no-fault benefits are aggregated together. SuppA-1-11, 150-90, 322-40, 355-61 (Dist. Ct. Dkts. 63-1, 63-8 to -11, 63-17, 63-18, 63-22).[4]

---

[4] The State Farm Companies have moved for leave to file a Supplemental Appendix. That motion is pending. In the event the motion is granted, the State Farm Companies have provided citations to the Supplemental Appendix ("SuppA"), and corresponding citations to the District Court docket.

But it is the single bill for a single patient that is at issue in the no-fault lawsuits and arbitrations—where it is exceedingly difficult (if not impossible) to prove Defendants' complex fraud. And the State Farm Companies could not realistically place at issue in each lawsuit and arbitration evidence of the patterns of fraud revealed by the thousands of other actions.

It is similarly impossible to prove Defendants' overarching fraud in state no-fault actions because there is a policy against consolidation of no-fault claims. "'Consolidation is highly disfavored by courts in no-fault insurance cases' and usually requires that the claims arise out of the same accident." *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 229 (E.D.N.Y. 2018) (quoting *Urban Radiology, P.C. v. GEICO Ins. Co.*, No. 141235/2008, 28 Misc. 3d 1230(A), 2010 WL 3463018, at *1 (N.Y. Civ. Ct., Kings Cty. 2010)). For example, in *Radiology Res. Network, P.C. v. Fireman's Fund Ins. Co.*, the First Department held the plaintiff's 68 claims for no-fault benefits should be tried separately because even if the 68 insurance policies were identical, "each claim will raise unique legal and factual issues." 12 A.D.3d 185, 185 (N.Y. 1st Dep't 2004); *Stephens v. Allstate Ins. Co.*, 185 A.D.2d 338, 339 (N.Y. 2d Dep't 1992) (affirming denial

of consolidation where the no-fault actions "ar[ose] out of separate incidents and separate claims"). Moreover, the Second Department has held the *denial* of a motion to sever is an abuse of discretion where the claims at issue arose from "47 different automobile accidents on various dates in which the 47 unrelated assignors suffered diverse injuries and required different medical treatment." *Poole v. Allstate Ins. Co.,* 20 A.D.3d 518, 519 (N.Y. 2d Dep't 2005).

Here, Defendants' claims for reimbursement are all part of the same fraud, but the patients, medical conditions, and other circumstances are unique such that consolidation is unavailable in state court. In short, "[c]omplex fraud and RICO claims . . . cannot be shoehorned into this [no-fault] system." *Gov't Emps. Ins. Co. v. Beynin,* No. 19-cv-6118, 2021 WL 1146051, at *6 (E.D.N.Y. Mar. 25, 2021) (quoting *Mun,* 751 F.3d at 99).

It is no answer to say the State Farm Companies may litigate the global fraud in federal court without an injunction. If the no-fault actions and arbitrations are allowed to proceed to judgment or resolution, it might be argued those decisions have a creeping *res judicata* effect on the federal claims, which could deny the State Farm Companies complete relief in any forum. The District Court did not

32

abuse its direction in finding that injunctive relief is necessary to preserve the State Farm Companies' ability to bring their fraud claims.[5]

This Court's analysis in the two-page summary order in *Allstate Ins. Co. v. Harvey Family Chiropractic* is not to the contrary. 677 F. App'x 716 (2d Cir. 2017) (summary order). In *Harvey,* this Court held the plaintiff-insurer failed to demonstrate irreparable harm and affirmed the denial of a preliminary injunction that would have enjoined no-fault claims pending in state court. *Id.* at 717–18. The Court determined that "'mere injuries'" to the insurer "'in terms of money, time and energy necessarily expended' absent a stay of ongoing state court and arbitration proceedings 'are not enough' to

---

[5] Contrary to the Alon Defendants' assertion, *see* Alon Op. Br. 21, this risk of *res judicata* exists for both state-court judgments and arbitration decisions. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81 (1984) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."); *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 267 (2d Cir. 1997) (explaining that under New York law, "res judicata and collateral estoppel apply to issues resolved by arbitration 'where there has been a final determination on the merits'" (quoting *Hilowitz v. Hilowitz,* 444 N.Y.S.2d 948, 949 (N.Y. App. Div. 1981)).

33

establish irreparable harm." *Id.* at 718 (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995)).

Defendants contend the District Court erred by not applying the outcome of *Harvey* to the facts of this case. Metro Pain Op. Br. 11; Alon Op. Br. 8. But, as the District Court recognized, even if the summary order in *Harvey* had precedential effect, Defendants' reliance on *Harvey* is misplaced. SPA-43-44.

In *Harvey*, the insurer could easily demonstrate the defendants' alleged fraud on a piecemeal, case-by-case basis. There, the theory of fraud was that the defendants' corporate entity was not owned by a licensed physician. *See* Br. for Plaintiffs-Appellants at 3-4, 12-16, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. July 13, 2016), *available at* 2016 WL 3855272. That sort of fraudulent billing practice is easily shown based on the facts of a single case or a single fraudulently submitted bill.

Here, in contrast, the fraud hinges on a predetermined treatment protocol, which becomes apparent only when the claims are viewed as a whole. Thus, absent an injunction, the State Farm Companies would be effectively denied their day in court. This is an injury beyond "money, time and energy necessarily expended absent

34

a stay." *Harvey*, 677 F. App'x at 718 (internal quotation marks omitted). Further, this critical difference between *Harvey* and the present case demonstrates why Defendants are mistaken in their repeated assertions that if irreparable harm is found here, then "virtually every No-Fault action brought in this District automatically satisfies the prerequisite for alleging irreparable harm." *E.g.*, Metro Pain Op. Br. 11; Alon Op. Br. 8. The irreparable harm at issue here is unique to cases like this one, where the fraud is obscured in individual no-fault actions. Not every case of insurance fraud will involve this unique predicament.

In addition, the parties in *Harvey* agreed, and this Court assumed, that any state-court judgments would *not* be *res judicata* in the federal action. *See Harvey*, 677 F. App'x at 718 (Allstate would be "free to recover those payments should they prevail on their RICO claim"); *see also* Br. for Defendants-Appellees at 11, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. Sept. 19, 2016), *available at* 2016 WL 5118452 ("Plaintiff-Appellant(s) does not explain that even if required to pay as a result of those pending matters [in state-court] why Plaintiff-Appellant(s) cannot be made whole by any judgment in this action."); Reply Br. for Plaintiffs-

Appellants at 10-11, *Allstate Ins. Co. v. Harvey Family Chiropractic*, No. 16-1101 (2d Cir. Oct. 7, 2016), *available at* 2016 WL 5929097 ("If Defendants-Appellees are permitted to continue filing and pursuing hundreds of claims in state courts seeking reimbursement from Plaintiffs-Appellants to which they are not entitled . . . the risk of contradictory decisions which *may then be rendered unenforceable by a decision in the instant action* would constitute an irreparable harm." (emphasis added)).

Here, in contrast, the District Court recognized there is a real risk that "inconsistent judgments" will hinder full litigation of the declaratory judgment claim through *res judicata. See* SPA-43. Defendants party to this appeal have not denied they would pursue such an argument. *See* Dist. Ct. Dkt. 93-2 at 25. And if Defendants prevailed on this theory of preclusion, it would undermine the State Farm Companies' ability to prove the fraud in the federal action. After all, a state-court finding of medical necessity might bar the State Farm Companies from proving Defendants provided medically unnecessary protocol treatment.

The District Court recognized that *Harvey* "does not address the risk of inconsistent judgments." SPA-43. And other district courts

36

agree: "[T]he Second Circuit said nothing of the risk of inconsistent judgments [in *Harvey*]." *E.g., Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 451 (E.D.N.Y. 2020). Thus, unlike in *Harvey*, the State Farm Companies might *not* be "free to recover those payments should they prevail on their RICO claim." *Harvey*, 677 Fed. App'x at 718. And even *Harvey* acknowledges that "[i]rreparable harm exists 'where, but for the grant of equitable relief, there is a *substantial chance* that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *Id.* (emphasis added) (quoting *Brenntag Int'l*, 175 F.3d at 249). Such a substantial chance exists here.

**2. Absent an Injunction, Defendants Will Use Reimbursements Paid by the State Farm Companies to Perpetuate the Fraud, Dissipate Assets, and Waste Time and Resources.**

In addition to denying the State Farm Companies their day in court, the absence of an injunction would inflict irreparable harm in at least three other ways:

*First*, without an injunction, Defendants would be permitted to continue using no-fault actions to monetize their fraud against the State Farm Companies. This is a unique irreparable harm because

37

Defendants are essentially financing their fraudulent practices with proceeds paid by the State Farm Companies. At least some of the Defendants have represented they immediately funnel reimbursements from the State Farm Companies back into the fraudulent enterprise.[6]

RICO expressly contemplates an injunction in this situation. Congress authorized federal courts to "prevent and restrain violations" of the RICO statute. 18 U.S.C. § 1964(a). This Court has held this provision "grants courts broad discretion and latitude in enjoining violators from activities that might lead to future violations." *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 995 F.2d 375, 377 (2d Cir. 1993). Thus, this type of irreparable harm—where the State Farm Companies' own

---

[6] *See* A-480, ¶ 13 (Dr. Shapiro averring a delay in no-fault benefits "will have an immediate and very likely irreversible debilitating impact on" cash flow and the ability to pay operating costs); A-486, ¶ 10 (Dr. Moshe averring, "In the absence of timely payment by [the State Farm Companies], it would cause a severe cash flow issue for CitiMedical I, PLLC."); *see also* Dist. Ct. Dkt. 93-2 at 23-24 (Alon, Moshe, and their respective entities, arguing a delay in collecting insurance benefits will cause harm due to "substantially decreased revenue stream from all sources throughout the course of the pandemic").

funds are being used to further defraud it—justifies a preliminary injunction.

*Second,* there is a real risk that, absent injunctive relief, the State Farm Companies will not be able to obtain full declaratory relief as requested, nor will they able to collect on their claims against many of the Defendants. The FAC's declaratory judgment count seeks declarations that the State Farm Companies do not owe Defendants anything on identified claims, including claims that are the subject of state-court suits and arbitrations. A-201-02. Any judgment on these identified claims reduces the District Court's ability to declare the State Farm Companies do not owe coverage for that claim. Further, Defendants have represented they quickly dissipate the assets they derive from pursuing no-fault actions against the State Farm Companies, heightening the risk that Defendants will be judgment-proof—meaning the State Farm Companies will never be able to recover their own money paid to Defendants during the pendency of this action.[7]

---

[7] *See* footnote 6, *supra.*

In these circumstances, courts have found the threatened dissipation of assets constitutes irreparable harm justifying a preliminary injunction, where ancillary to the final relief or authorized by statute. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131-32 (2d Cir. 2014) (holding courts may freeze assets in favor of plaintiffs seeking accounting in trademark-infringement cases); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (holding court may preliminarily enjoin defendant from dissipating assets to preserve equitable remedies); *see also Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 326 (1999) (holding a preliminary injunction to prevent dissipation of assets is authorized if ancillary to the final relief or authorized by statute).

*Third*, absent injunctive relief, the State Farm Companies would be required to expend significant time and resources responding to the ongoing lawsuits and arbitrations. At the time the State Farm Companies moved for the preliminary injunction, Defendants had filed nearly 3,000 arbitrations and state-court lawsuits against the State Farm Companies seeking payment on their fraudulent bills. A-255, ¶ 5. And Defendants are likely to file new arbitrations and

40

lawsuits to recover additional unpaid sums absent injunctive relief. A-256, ¶ 9 (declaration swearing to this fact based on Defendants' pattern of behavior). As the District Court noted, "wasting time and resources in arbitrations with awards that might eventually be, at best, inconsistent with judicial rulings and, at worst, essentially ineffective, constitutes irreparable harm." SPA-45 (quoting *Gov't Emps. Ins. Co. v. Cean,* No. 19-cv-2363, 2019 WL 6253804, at *5 (E.D.N.Y. Nov. 22, 2019)). This is particularly true where the unquantifiable burdens placed on the State Farm Companies by these numerous individual proceedings are designed to discourage careful consideration of, and challenges to, Defendants' conduct.

In short, injunctive relief is necessary to preserve the State Farm Companies' ability to properly litigate and adjudicate their fraud claims. And the District Court did not abuse its discretion in issuing an injunction to prevent future RICO violations and other irreparable harm to the State Farm Companies while this action is pending.

41

**B.  The State Farm Companies Have Raised Serious Questions Going to the Merits Sufficient to Make Them Fair Grounds for Litigation.**

To obtain a preliminary injunction, the State Farm Companies must show "either a likelihood of success on the merits, or a serious question going to the merits to make [it] a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Metro. Taxicab*, 615 F.3d at 156. The district court correctly found there are at least sufficiently serious questions going to the merits.

The inquiry as to the merits is intended to be "flexible." *Citigroup*, 598 F.3d at 38; *see also Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 36 (2d Cir. 1988) ("The district court is expected to use the flexibility traditionally associated with equitable remedies."). Under this flexible approach, an injunction is warranted where "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). As such, a district court can grant a preliminary injunction "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the

42

underlying claims," as long as "the costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35.

The State Farm Companies have met this standard. Indeed, as the District Court appropriately recognized, the State Farm Companies provided detailed allegations and exhibits explaining Defendants' fraudulent treatment and billing scheme. SPA-36-40. The First Amended Complaint explains in detail Defendants' predetermined treatment protocol, by which Defendants provide medically unnecessary and fraudulent examinations, treatments, testing, and supplies. A-51–56, A-107–151 (FAC ¶¶ 10-18, 186-309).

Under Defendants' fraud:

- patients are generally subjected to the same treatments and treatment plan regardless of medical need, *e.g.,* A-109-151 (FAC ¶¶ 190-99, 202, 207, 219-20, 222, 231-33, 236-40, 251, 295-96, 302-08);

- initial examination reports used to justify further treatment consist of cursory information, "template histories," and "general nonspecific diagnoses," A-110 (FAC ¶ 192);

- follow-up examinations involve "at most, cursory examinations of patients—the purpose of which appears to be supporting the continuation of the Predetermined Treatment Protocol," A-111-12 (FAC ¶ 197);

- the "medically unnecessary treatment often continues for months without improvement or resolution," A-107 (FAC ¶ 187);

43

- the type and amount of treatment selected reflects "an intention to maximize the amount that can be collected and to exploit the New York fee schedule governing No-Fault claims," A-108 (FAC ¶ 188); *see also, e.g.,* A-113-47 (FAC ¶¶ 202, 204, 208, 221, 224, 242-44, 246, 271, 293); and

- there is no record of coordination of care among the various healthcare providers rendering treatment to the same patient, as would normally be expected, A-108–09 (FAC ¶ 189).

The First Amended Complaint also alleges the scheme involves illegal kickbacks in exchange for patient referrals, and that "no provider would have been granted access to these patients without paying to play." A-96 (FAC ¶ 152); *see also e.g.,* A-82-97 (FAC ¶¶ 122-24, 128, 133-34, 137, 142-44, 150-51, 154). These detailed allegations are not conclusory speculation, as Defendants claim. *E.g.,* Metro Pain Op. Br. 13. And in any event, contrary to Defendants' arguments, these kickbacks are not the only allegation linking Defendants to the RICO enterprise. *Id.* Rather, Defendants participated in the predetermined treatment protocol to provide medically unnecessary services.

The State Farm Companies also provided documentary support. Attached to the First Amended Complaint are a number of exhibits, including summaries of treatments rendered, testing performed, and

44

supplies prescribed at Defendants' clinic locations. SuppA-1-11, 150-90, 322-40, 355-61 (Dist. Ct. Dkts. 63-1, 63-8 to -11, 63-17, 63-18, 63-22). These exhibits are based on medical records, billing data, and payment data, and demonstrate Defendants' treatment of patients followed the same predetermined plan, regardless of medical need. *See id.* The exhibits also include examples of initial examination reports and follow-up reports from actual patients. The initial examination reports exemplify the cursory information, template patient histories, and nonspecific, preprinted diagnoses that such reports typically contain. SuppA-12-69, 191-246, 265-304 (Dist. Ct. Dkts. 63-2, 63-12, 63-15). The follow-up reports demonstrate the identical language often used to describe and justify continuation of the treatment plan, regardless of the patient's documented clinical status. *E.g.*, SuppA-101-49 (Dist. Ct. Dkt. 63-7).

The First Amended Complaint also incorporates sworn testimony from Defendants and others—testimony that was provided during depositions or examinations under oath. For example, it includes sworn testimony that Metro Pain paid a marketing company owned by Alon $10,000 per month, A-49–50 (FAC ¶ 5), and that there

45

was no difference between Metro Pain and Tri-Borough with respect to the scope of their medical practices, A-97 (FAC ¶ 154).

The foregoing is sufficient to show serious questions going to the merits. Defendants do not dispute the detailed nature of the First Amended Complaint and its exhibits. Rather, they argue the State Farm Companies made an inadequate showing simply because some of the allegations and evidence are unsworn. But Defendants ignore that the "serious questions" standard is "the more flexible standard for a preliminary injunction." *Citigroup*, 598 F.3d at 38. It is less rigorous than the "likelihood of success" standard. *See, e.g., Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 n.22 (2d Cir. 2019), *vacated and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *Cent. Rabbinical Cong. of U.S. & Can. v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (referring to the likelihood of success standard as "more rigorous" than the sufficiently serious questions standard); *Metro. Taxicab*, 615 F.3d at 156 (same). And as particularly relevant here, the sufficiently serious questions standard provides needed flexibility "in the face of . . . the greater uncertainties inherent at the outset of

46

particularly complex litigation" like this case. *Citigroup*, 598 F.3d at 35.

Using this flexible standard, district courts in this circuit regularly find sufficiently serious questions going to the merits based solely on the allegations in the complaint. *See, e.g., Gov't Emps. Ins. Co. v. Landow*, No. 21-cv-1440, 2022 WL 939717, at *12 (E.D.N.Y. Mar. 29, 2022); *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 499 (E.D.N.Y. 2021); *Gov't Emps. Ins. Co. v. Zaitsev*, No. 20-cv-3495, 2021 WL 3173171, at *2 (E.D.N.Y. July 27, 2021); *Gov't Emps. Ins. Co. v. Strut*, No. 19-cv-728, 2020 WL 1820500, at *2 (W.D.N.Y. Apr. 10, 2020). As one district court noted, "[w]hile many courts have granted injunctions after considering a more developed record, a complaint alone can be sufficient to grant an injunction." *Gov't Emps. Ins. Co. v. Moshe*, No. 20-cv-1098, 2020 WL 3503176, at *2 (E.D.N.Y. June 29, 2020).

Here, the allegations in the First Amended Complaint are based on a thorough pre-suit investigation, sworn testimony, and attached exhibits. At this procedural stage, the allegations about Defendants'

47

fraudulent scheme raise serious questions going to the merits. The District Court's finding to that effect was not an abuse of discretion.[8]

### C. The Balance of the Equities Tips Decidedly in Favor of the State Farm Companies.

For reasons similar to those discussed in the analysis of irreparable harm, the balance of the equities tips decidedly in the State Farm Companies' favor. Absent an injunction, there is a serious risk the State Farm Companies will be unable to prove the full scope of Defendants' fraud. And not only will the State Farm Companies be prevented from obtaining complete relief for the harm they have suffered, but Defendants' fraud harms the no-fault system as a whole.

In contrast, there is no risk Defendants would be similarly denied their day in court if the state-court proceedings are enjoined.

---

[8] In addition, the proposed Second Amended Complaint (*see* footnote 1, *supra*) incorporates sworn evidence in the form of verified exhibits to the Second Amended Complaint. Specifically, like the First Amended Complaint, the Second Amended Complaint references, relies on, and attaches a number of charts that summarize the treatments and services provided, or purportedly provided, to patients, for which Defendants submitted, or caused to be submitted, claims to the State Farm Companies. Aggregated together, these claims show the predetermined treatment protocol, and improbable treatment patterns that evidence a lack of medically necessity.

Indeed, Defendants can fully litigate their claims in this very action. If the State Farm Companies prevail here, then Defendants' state-court actions and arbitrations will necessarily be resolved in the State Farm Companies' favor. To the extent Defendants' entitlement to benefits is not resolved in these proceedings, then at their conclusion, Defendants can pursue their claims in the state-court proceedings and arbitrations—and may be able to argue that aspects of this case should have preclusive effect in those proceedings.

The only possible harm Defendants identify is a delay in recovery of no-fault benefits—and the possible exhaustion of patients' no-fault benefits as a result. Metro Pain Op. Br. 23-27; Alon Op. Br. 21-22. But this is insufficient to tip the balance of hardships in their favor. Defendants make generalized claims about hardships due to a delay in payment. Metro Pain Op. Br. 23-24; Alon Op. Br. 20. But they are unable to provide meaningful specifics, even though payments on many claims had already been awaiting adjudication in a no-fault action for a year or more before the State Farm Companies moved for a preliminary injunction. *See* A-258-301 (listing file date for no-fault actions pending when the State Farm Companies' moved for preliminary injunction). And despite Defendants' projections

49

about the ruinous effects of an injunction, they appear to remain in business and continue to submit claims to the State Farm Companies.

As the District Court appropriately recognized, "a stay of proceedings does not deprive Defendants of their rights as they would be entitled to any balance owed plus interest if they eventually prevail on the claims." SPA-49.

Moreover, if Defendants obtained damages in the state-court proceedings and arbitrations, they could use those fraudulently obtained sums to fund their fraudulent scheme. Defendants built their scheme on a pattern of providing extensive, unnecessary treatment to patients, and then arbitrating or litigating any attempt by the State Farm Companies to resist payment for these fraudulent services. Any damages obtained through arbitration or state-court proceedings could be used to continue this practice and allow Defendants to continue to perpetuate their fraud against the State Farm Companies. Thus, if Defendants obtain damages in the state-court proceedings and arbitrations, then this would severely harm the State Farm Companies, because their own money would effectively fund Defendants' fraud.

50

Defendants' vague and unsupported assertions regarding the threat of policy exhaustion do not tip the balance of hardships in their favor. The District Court correctly held that, compared to the risk the State Farm Companies would be unable to vindicate the fraud absent an injunction, Defendants' "competing concern of policy exhaustion" did not involve "a similar level of uncertainty." SPA-47. And in any event, Defendants failed to "identify any set of policies nearing exhaustion." *Id.*

Defendants respond only that they had no obligation to identify policies nearing exhaustion because they "do not bear the burden of proof." Metro Pain Op. Br. 27. But the balancing of parties' competing claims of hardship necessarily requires courts to consider the factual support provided by both parties—or lack thereof. The District Court did not abuse its discretion here by doing just that.

In other words, courts "must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A district court's determination of which party would suffer the greater hardship is a "quintessential exercise" of the

51

court's discretion. *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 45 (2d Cir. 2020) (summary order). And where, as here, a party fails to set forth any facts supporting the hardships it claims it will suffer, the court does not abuse its discretion in declining to credit those unsupported allegations of hardship. *See Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Loc. 2-286 v. Amoco Oil Co. (Salt Lake City Refinery)*, 885 F.2d 697, 709 (10th Cir. 1989) (affirming grant of preliminary injunction where the district court "found no evidence" of defendants' claimed hardships); *Hamilton Watch Co.*, 206 F.2d at 743 (affirming grant of preliminary injunction where "no substantial harm from the injunction to defendant [wa]s perceptible"); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (finding the balance of hardships tipped in plaintiff's favor where the defendant "submitted no evidence" to support the defendant's competing claim of injury).

Thus, in weighing the real harm to the State Farm Companies against a claimed but unproven harm to Defendants, the District Court did not abuse its discretion in finding this factor plainly supports a preliminary injunction.

52

**D.** **The Public Interest Supports Enjoining Defendants' Massive Fraud.**

The harm absent an injunction extends beyond just the harm to the State Farm Companies: Defendants' fraud harms New York's no-fault insurance system and consumers as a whole. Payment of fraudulent no-fault benefits violates the public interest—especially where Defendants are using those payments to perpetuate the fraud. In particular, "payment of fraudulently obtained No-Fault benefits, *without available recourse,* serves to undermine and damage the integrity of the No-Fault system, which was created as a social reparations system for the benefit of consumers." *Mun,* 751 F.3d at 100 (emphasis added) (quoting Ltr. from Lawrence Fuchsberg, Supervising Att'y, N.Y. Ins. Dep't, to Francis J. Serbaroll, Cadwalader, Wickersham & Taft (Nov. 29, 2000)). Fraud "is a costly and pervasive drain on the national [and statewide] healthcare system." *Parisien,* 352 F. Supp. 3d at 232 (quoting N.Y. State Dep't of Fin. Servs., *Investigating and Combating Health Insurance Fraud* 3, 5 (Mar. 15, 2018)).

Thus, preventing fraud—and ensuring an actual remedy for that fraud—is critical to New York's no-fault system. *See id.* As such,

53

this Court has recognized "the prevention of insurance fraud for the protection of consumers in New York" is an "important public policy interest." *Mun,* 751 F.3d at 100. Moreover, the public interest will be well served by the efficiency of resolving the issues in a single proceeding.[9]

## II. As to Defendants' Appeal, the District Court Correctly Determined the FAA Does Not Bar the Enjoining of Future and Pending Arbitrations.

Defendants argue the FAA deprived the District Court of jurisdiction to enjoin the no-fault arbitrations because the FAA requires courts to enforce valid agreements to arbitrate. Defendants claim the injunction and stay "make[s] a nullity out of medical providers' right to arbitrate under the FAA." Alon Op. Br. 25.

But the FAA is not implicated in the first place. As the District Court correctly held, the FAA does not mandate arbitration in cases like this one, where the arbitration clauses are not the result of a bargained-for contract, but rather, are mandated by New York law.

---

[9] The Alon Defendants allude to patients being denied their "providers of choice" due to Defendants' purported inability to treat patients due to the economic hardships. Alon Op. Br. 11-12. But the services at issue are not unique, and a multitude of provider options exist in the New York City metropolitan area.

54

*See* SPA-17-19. Indeed, the FAA speaks in terms of "contract[s]": It sets forth a policy of enforcing arbitration agreements contained in "[a] written provision in any . . . *contract.*" 9 U.S.C. § 2 (emphasis added).

Thus, the FAA "requires courts to enforce *privately negotiated agreements* to arbitrate." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (emphasis added) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). But the FAA is not implicated where the parties have not voluntarily agreed to arbitration. *See Volt Info. Scis.,* 489 U.S. at 478; *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960))).

Here, the arbitration clause is mandated by New York's no-fault law. *See* N.Y. Ins. Law § 5106(b). There is no contract as required by the FAA, and the parties have therefore not entered into a "privately negotiated agreement[ ] to arbitrate." *UBS Fin. Servs.*, 660 F.3d at 649. That is, the "parties cannot be said to have evinced an intention or bargained for the right to arbitrate affirmative fraud claims

55

through their private agreements" where "local law mandates that disputes be arbitrable." *Allstate Ins. Co. v. Lyons,* 843 F. Supp. 2d 358, 380 (E.D.N.Y. 2012).

Ignoring the FAA's text, Defendants argue it applies to the State Farm Companies simply because they "cho[se] to do business in New York." Alon Op. Br. 24; *see also* Metro Pain Op. Br. 34. But the State Farm Companies' decision to offer insurance in New York is a far cry from a *privately negotiated* arbitration agreement. For example, neither the State Farm Companies nor Defendants, for that matter, had a choice as to the terms of any required arbitration. *See* N.Y. Ins. Law § 5106(b) (requiring no-fault arbitrations to be held "pursuant to simplified procedures to be promulgated or approved by the superintendent").

This Court's decision in *In re American Express Financial Advisors Securities Litigation,* does not compel a different result. 672 F.3d 113 (2d Cir. 2011). In that case, as the Metro Pain Defendants correctly state, this Court relied on the FAA to hold that the district court lacked authority to enjoin arbitration, which the defendant had agreed to by virtue of its membership in FINRA. Metro Pain Op. Br. 35. But there, the defendant did not argue—and this Court did not

56

consider—whether the FAA applied in the first place. *Am. Express*, 672 F.3d at 140-42. Rather, the issue was whether the district court could enjoin arbitration where a class-action settlement had revoked the plaintiffs' right to arbitrate certain claims. *Id.* Moreover, in grappling with this issue, this Court acknowledged that "[t]o allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit of" the FAA. *Id.* at 141 (quoting *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981)).

In sum, *American Express* did not resolve the issue presented in this case—whether the FAA applies to arbitration mandated by a state statute—and it suggests the FAA is not concerned with enjoining arbitration proceedings not called for by contract. Thus, the FAA poses no barrier to enjoining the no-fault arbitrations in this case.

**III. As to the Cross-Appeal, Two Exceptions to the Anti-Injunction Act Permit the District Court to Enjoin Defendants' Pending State-Court Actions.**

The Anti-Injunction Act provides a federal court "may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Thus, state-court proceedings may not be enjoined unless one of the Act's three exceptions applies. 28 U.S.C. § 2283.

Here, two of those exceptions permit an injunction of Defendants' pending state-court actions. First, an injunction is "expressly authorized by [an] Act of Congress," *id.*—namely, RICO, which authorizes courts to "prevent and restrain violations of [the Act]," 18 U.S.C. § 1964(a). Second, because the no-fault actions are incapable of addressing the State Farm Companies' claims of fraud, an injunction is "necessary in aid of [this Court's] jurisdiction" to provide a forum capable of resolving the full scope of the State Farm Companies' claims. 28 U.S.C. § 2283.

Under either exception, the District Court may enjoin Defendants' pending State-court actions without violating the Anti-Injunction Act. And because the District Court's refusal to do so was

58

predicated on a misunderstanding of the statute, it necessarily abused its discretion when it declined to enjoin the pending state no-fault actions.

## A.    The Injunction Was Expressly Authorized by an Act of Congress.

An injunction issued under the circumstances of this case would be "expressly authorized by [an] Act of Congress." 28 U.S.C. § 2283. Under this exception to the Anti-Injunction Act, the Court asks simply "whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 238 (1972).

Critically, under *Mitchum*'s test, "no prescribed formula is required; an authorization need not expressly refer to § 2283." *Id.* at 237 (quoting *Amalgamated Clothing Workers of Am. v. Richman Bros. Co.*, 348 U.S. 511, 516 (1972)). In addition, "a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception." *Id.*

Here, both steps of the test set forth in *Mitchum* are met. First, RICO—the federal statute under which this suit is brought—is a

59

uniquely federal remedy that authorizes private parties to obtain equitable relief to "prevent and restrain violations" of the statute. 18 U.S.C. § 1964(a). Second, RICO can be given its intended scope only by a stay of the state-court proceedings.

### 1.    RICO is a Unique Federal Remedy that Authorizes Private Parties to Obtain Injunctive Relief.

Properly understood, *Mitchum*'s reference to "a specific and uniquely federal right or remedy" requires only that a federal statute create a remedy that did not exist at common law. *See Mitchum*, 407 U.S. at 237. The statute at issue in *Mitchum*—18 U.S.C. § 1983—was enacted to "enforce the provisions of the Fourteenth Amendment 'against State action'" where state remedies and state courts were "powerless to stop deprivations." *Id.* at 240. Thus, "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people," and for that reason, the Supreme Court held "§ 1983 is an Act of Congress that falls within the 'expressly authorized' exception." *Id.* at 242-43.

Like § 1983, RICO was enacted to provide a federal remedy for wrongs that states otherwise did not have a mechanism to redress. Congress enacted civil RICO because it saw a need to provide relief

60

to those wronged by interstate racketeering enterprises. *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985). And civil RICO was intended to operate in the space where state and common-law remedies did not exist or were otherwise inadequate. *E.g.*, *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) ("[T]he purpose of civil RICO liability does not extend to deterring any illegal act . . . for which there are state and common law remedies."). Thus, civil RICO provides a "specific and uniquely federal right or remedy." *Mitchum*, 407 U.S. at 237.

On top of that, the uniquely federal right and remedy created by RICO is "enforceable in a federal court of equity." *Mitchum*, 407 U.S. at 237. *Mitchum* held this requirement was met because § 1983 "expressly authoriz[ed] a 'suit in equity' as one of the means of redress." *Id.* at 242 (quoting 42 U.S.C. § 1983)). RICO similarly authorizes private parties to obtain equitable relief to "prevent and restrain violations" of that statute. 18 U.S.C. § 1964(a).

This Court held as much in *Chevron Corp. v. Donziger*, based on the traditional power of the district courts to fashion equitable remedies, § 1964(a)'s expansive language, and RICO's broad remedial purpose. 833 F.3d 74, 137 (2d Cir. 2016). And this Court recently

reaffirmed *Donziger's* holding that private RICO plaintiffs may obtain injunctive relief. *See Gingras v. Think Fin., Inc.* 922 F.3d 112, 124 (2d Cir. 2019) ("[B]inding Circuit precedent compels us to hold that RICO authorizes private rights of action for injunctive relief." (citing *Donziger*, 833 F.3d at 137)). In fact, § 1964(a) "made express what was already inherent—that in civil RICO actions, as in other civil actions, the federal district courts have broad equitable powers." *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 244 (S.D.N.Y. 2002) (Rakoff, J.) (granting preliminary injunctive relief to private RICO plaintiffs); *Aetna Cas. & Sur. Co. v. Liebowitz*, 570 F. Supp. 908, 910 (S.D.N.Y. 1983) (Pratt, J., sitting by designation) (reasoning "§ 1964(a) gives the court broad jurisdiction to remedy violations of § 1962 'by issuing appropriate orders,'" including preliminary injunctions), *aff'd*, 730 F.2d 905 (2d Cir. 1984).

Thus, RICO meets the first part of *Mitchum*'s test: It is a uniquely federal right and remedy that authorizes private parties to obtain injunctive relief.

### 2. RICO Could Be Given Its Intended Scope Only by a Stay of the State-Court Proceedings.

RICO also satisfies the second prong of the *Mitchum* test: It is a federal statute that authorizes private parties to obtain equitable relief to "'prevent and restrain violations,'" 18 U.S.C. § 1964(a), and it can be "given its intended scope only by [authorizing] the stay" of "state court proceeding[s]" that are used to violate RICO, *Mitchum*, 407 U.S. at 238.

Under this test, the RICO statute need not expressly refer to § 2283, nor must it expressly authorize an injunction of a state-court proceeding. *Id.* Thus, in *Mitchum*, the Supreme Court held that Section 1983's reference to a "suit in equity," bolstered by the Reconstruction-era Congress's general distrust of State actors to vindicate federally protected rights, was enough to satisfy the expressly authorized exception. *See id.* at 238-43.

The same concerns that animated *Mitchum* suggest the Congress that enacted RICO intended to allow federal courts to enjoin state-court litigation. *Mitchum* recognized the need for the "expressly authorized" exception to extend to § 1983 precisely because "state courts [had been] used to harass and injure individuals, either

63

because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." 407 U.S. at 240.

The facts here illustrate the first concern mentioned in *Mitchum*: Defendants are using a pattern of baseless state no-fault proceedings to monetize and perpetuate their violations of RICO—to harass and injure the State Farm Companies. And because of the fragmented nature of Defendants' no-fault proceedings, the "state courts [are] powerless to stop [the] deprivations," *Mitchum*, 407 U.S. at 240. Indeed, the state-court litigation is a component of the overall fraud scheme alleged in the federal action; it is Defendants' means of collecting on their fraudulent claims for reimbursement and provides a financial lifeline for their scheme. In addition, the global and intertwined nature of the fraud is effectively obscured in the piecemeal state-court proceedings and arbitrations. Thus, an injunction here is supported by the facts of *Mitchum* itself.

What's more, under circumstances similar to those here, a majority of the justices in *Vendo Co. v. Lektro-Vend Corp.* recognized that where a federal statute authorizes an injunction, and where a litigant files a multiplicity of state-court cases in violation of that

statute, the "expressly authorized" exception is satisfied. 433 U.S. 623 (1977). True, a three-justice plurality in *Vendo* stated that § 16 of the Clayton Act, 15 U.S.C. § 26, could never satisfy the "expressly authorized exception. *Id.* at 630-41 (plurality op.). But four other justices would have held a federal court may use § 16 to enjoin even a single "state-court litigation which is being prosecuted in direct violation of the Sherman Act." *Id.* at 647, 656-58 (Stevens, J., with whom Brennan, White, and Marshall, JJ., joined, dissenting). And the remaining two justices, Justice Blackmun and Chief Justice Burger, explained that an injunction may issue against state-court proceedings where "those proceedings are themselves part of a 'pattern of baseless, repetitive claims' that are being used as an anticompetitive device" in violation of the Sherman Act. *Id.* at 644 (Blackmun, J., with whom Burger, C.J., joined, concurring). The concurring Justices joined the result of the plurality opinion only because there was no evidence of a multiplicity of state-court proceedings in *Vendo*. *See id.*

Under Supreme Court precedent, Justice Blackmun's concurring opinion in *Vendo* is controlling: "When a fragmented Court decides a case and no single rationale explaining the result

65

enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States,* 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Thus, the authors of Federal Practice and Procedure have read *Vendo* to establish "that § 16 [of the Clayton Act] is an express authorization for an injunction against a pattern of baseless, repetitive claims that are being used as an anti-competitive device because the two concurring justices would go that far and the four dissenters would go even farther." 17A Charles Alan Wright, *et al.,* Federal Practice & Procedure § 4224, at 87 (3d ed. 2007).

A similar pattern of baseless, repetitive claims is at issue here. Defendants have filed over two hundred pending no-fault lawsuits to monetize their fraud in violation of RICO. A-297-301.

As for *Mitchum*'s second concern—that state courts might be "in league with those who were bent upon the abrogation of federally protected rights," 407 U.S. at 240—there is no evidence that concern is implicated in the State Farm Companies' case. But it is a concern that animated the Congress that enacted RICO. And the existence of

66

that concern further supports the notion that Congress intended for RICO to satisfy the "expressly authorized" exception to the Anti-Injunction Act.

One of the principal findings of the Katzenbach Commission, which led to the adoption of RICO, was that racketeering enterprises "flourish[ ] only where [they have] corrupted local officials." *The Challenge of Crime in a Free Society: A Report by the President's Commission on Law Enforcement and Administration of Justice* 191 (1967), *available at* https://tinyurl.com/mwkbvx9c (Katzenbach Commission Report); *accord* 116 Cong. Rec. S591 (daily ed. Jan. 21, 1970) (statement of Sen. McClellan) (same). And in discussing such local corruption, the Commission expressly noted the corruption of "judges" whose "legitimate exercise of duties would block organized crime and whose illegal exercise of duties helps it." Katzenbach Commission Report, *supra,* at 191; *accord Task Force Report: Organized Crime: Annotations and Consultants' Papers* 6 (1967), *available at* https://tinyurl.com/3rm7zjmh (same).

In addition, Senators McClellan and Hruska, the chief architects of RICO, noted that "the judiciary is not beyond [the] reach" of racketeering enterprises. 116 Cong. Rec. S596 (daily ed.

67

Jan. 21, 1970) (statement of Sen. McClellan). And they recognized that in some circumstances those enterprises "could not continue to operate without corrupt judges and prosecutors, or without the assistance of a handful of bribed police," *id.* at S603 (statement of Sen. Hruska).[10]

The point is that Congress anticipated state courts might be ineffective against a racketeering enterprise, and yet, Congress did "not [have to include] an express reference" to the Anti-Injunction Act to empower federal courts to enjoin state court proceedings that are brought in violation of RICO. *Mitchum,* 407 U.S. at 237. In this case, although there is no concern about judicial corruption, Defendants are using hundreds of individual state-court actions to obscure their broader RICO scheme, and they are using the judgments in those actions to finance the perpetuation of that scheme. In other words, Defendants are using a multiplicity of state-court litigation to monetize their RICO conspiracy.

The upshot is the Congress that authorized federal courts to "prevent and restrain violations" of RICO, 18 U.S.C. § 1964(a), would

---

[10] The Senate daily edition of the Congressional Record for January 21, 1970, is available here: https://tinyurl.com/mu8n4yjd.

68

have understood that this unique federal, equitable remedy could be "given its intended scope only by [authorizing] the stay" of state court proceedings used to further a RICO violation. *Mitchum,* 407 U.S. at 238. To hold otherwise would mean that federal courts are powerless to restrain racketeering enterprises that are using state-court proceedings to advance their illicit ends.

### 3. The District Court Erroneously Held the "Expressly Authorized" Exception Applies Only to Claims Subject to Exclusive Federal Jurisdiction.

The District Court did not disagree with any of the foregoing. Rather, the Court held the "expressly authorized" exception did not apply for a different, narrow reason.

According to the District Court, for a federal statute to create "a 'uniquely federal right or remedy' enforceable in a federal court of equity," it must create a right enforceable *only* in federal court. SPA-30-31 (quoting *Vendo,* 433 U.S. at 632). And because "civil RICO claims are subject to concurrent jurisdiction of both state and federal courts," the court held the "expressly authorized" exception could not apply. *See id.*

69

The District Court grounded this holding in the plurality's opinion in *Vendo* and the decisions of three other district courts. But in doing so, it erred in at least four respects:

*First*, the District Court's holding is contrary to *Mitchum*. There, the Supreme Court held 42 U.S.C. § 1983—a statute *not* subject to the exclusive jurisdiction of federal courts—"is an Act of Congress that falls within the 'expressly authorized' exception" of the Anti-Injunction Act. 407 U.S. at 243. Simply put, because state courts retain concurrent jurisdiction to entertain suits brought under Section 1983, *see, e.g., Martinez v. California*, 444 U.S. 277, 283 n.7 (1980), *Mitchum* cannot be understood to hold that a federal statute creates a "uniquely federal right or remedy" only if it grants exclusive jurisdiction to federal courts.

*Second*, in relying on *Vendo* to reach a contrary result, the District Court appears to have believed that Justice Rehnquist was writing for a majority of the Court when he wrote the Clayton Act provides "a 'uniquely federal right or remedy,' in that actions based upon it may be brought only in the federal courts." SPA-31-32 (quoting *Vendo*, 433 U.S. at 632). But in fact, Justice Rehnquist was delivering the opinion for a plurality of three justices. *Vendo*, 433 U.S.

70

at 632 (three-justice plurality op.). That non-binding opinion could not overrule *Mitchum.* Nor, for that matter, could the decisions of the three other district courts that the District Court invoked. SPA-32. Those decisions are contrary to *Mitchum* and contain no analysis to support their conclusion that a remedy must enforceable "*only*" in "federal court" to satisfy the "expressly authorized" exception. *Armstrong v. Real Est. Int'l, Ltd.*, No. 05-cv-5383, 2006 WL 354983, at *3 (E.D.N.Y. Feb. 14, 2006); *see also Bosch v. Lamattina*, No. 08-cv-238, 2008 WL 4820247, at *6 (E.D.N.Y. Nov. 4, 2008) (citing only *Armstrong* for this proposition); *Baumgarten v. Cnty. of Suffolk*, No. 07-cv-539, 2007 WL 1490482, at *4 (E.D.N.Y. May 15, 2007) (same).

*Third,* the District Court misinterpreted Justice Rehnquist's plurality opinion—for he did not suggest a test contrary to *Mitchum.* Rather, Justice Rehnquist stated: "The private action for damages conferred by the Clayton Act is a 'uniquely federal right or remedy,' *in that* actions based upon it may be brought only in the federal courts." *Vendo Co.*, 433 U.S. at 632 (three-justice plurality op.) (emphasis added). Justice Rehnquist's use of the phrase "in that" does not mean exclusive federal jurisdiction is required. At most, he suggested exclusive federal jurisdiction may be *sufficient*—but not

71

necessary—to satisfy *Mitchum*'s "uniquely federal" prong. *See In That*, Merriam-Webster Dictionary, tinyurl.com/yzj3c7ae ("*in that*—used to introduce a statement that explains or gives more specific information about what one has just said // The book is good, *in that* it's well written, but I didn't actually enjoy reading it."). In any event, the outcome of *Mitchum* would contradict any other interpretation of Justice Rehnquist's statement.

*Finally*, even if *Vendo* could be read as contrary to *Mitchum*, nothing in *Vendo* said so explicitly, and the Supreme Court has cautioned lower courts not to presume the Court overrules its decisions *sub silentio. E.g., Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio.*"). Thus, even if the District Court were faced with two plausible interpretations of *Vendo,* and even if Justice Rehnquist's plurality opinion were binding, the District Court was required to adopt the interpretation of *Vendo* consistent with the Supreme Court's holding in *Mitchum.*

The District Court compounded these errors when it rejected the State Farm Companies' motion for reconsideration. In that motion, the State Farm Companies pointed out that, because

72

*Mitchum* involved Section 1983, a statute over which state courts have concurrent jurisdiction, the "expressly authorized" exception cannot be limited to statutes over which federal courts have exclusive jurisdiction. The District Court disagreed.

According to the District Court, "[t]he Supreme Court decided *Mitchum* in 1972, and at that time, the Court understood section 1983 to offer a uniquely federal right or remedy." SPA-62. "It was not until the Supreme Court's 1980 decision in *Martinez v. California*," the District Court continued, "that the Supreme Court recognized in a footnote that a state court may properly accept jurisdiction over a section 1983 claim." *Id.* (citing *Martinez*, 444 U.S. at 283 n.7).

Thus, according to the District Court, the Supreme Court's understanding of Section 1983 changed fundamentally over the course of just eight years: Whereas, when *Mitchum* was decided, the Supreme Court believed Section 1983 was an exclusively federal remedy, *Martinez* declared, in a footnote, that state courts have concurrent jurisdiction over such claims. *Id.*

Put simply, the District Court got its history wrong. Even at the time *Mitchum* was decided, it was clear federal and state courts had concurrent jurisdiction over claims under Section 1983. For example,

73

five years before *Mitchum*, the Supreme Court recognized that Section 1983 provided a plaintiff a "*choice* of a federal forum for the hearing and decision of his federal constitutional claims." *Zwickler v. Koota*, 389 U.S. 241, 248 (1967) (emphasis added). That makes sense. The Supreme Court has long held "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (citing, among others, *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 25-26 (1820)).

Thus, state courts have treated Section 1983 as equally enforceable in their courthouses. *See Judo, Inc. v. Peet*, 326 N.Y.S.2d 441, 443 (N.Y. Civ. Ct. 1971) (rejecting attack on jurisdiction of state courts to entertain Section 1983 actions because "Federal Constitutional rights, may be protected in State courts"). Indeed, even pre-*Mitchum*, state courts regularly considered Section 1983 claims. *See Schneider v. Ohio Youth Comm'n*, 287 N.E.2d 633, 639 (Ohio Ct. App. 1972); *Hyman v. Hodge*, 9 V.I. 68, 69 (V.I. Mun. Dec. 31, 1971); *Wholesale Elec. & Supply, Inc. v. Robusky*, 258 N.E.2d 432, 435 (Ohio 1970); *Krieger v. State*, 283 N.Y.S.2d 86, 87 (N.Y. Ct. Cl. 1966); *Richardson v. Thompson*, 390 S.W.2d 830, 832 (Tex. Civ. App.

74

1965); *Maryland Comm. for Fair Representation v. Tawes*, 180 A.2d 656, 662 (Md. 1962); *Atterberry v. State*, 95 S.E.2d 787, 790 (Ga. 1956); *Charlotte Park & Recreation Comm'n v. Barringer*, 88 S.E.2d 114, 123 (N.C. 1955).

In addition, if the District Court's understanding of *Mitchum* and *Martinez* were correct, then *Martinez* would have effectively overruled *Mitchum.* That is because, according to the District Court, *Martinez* sets forth a "change in the Supreme Court's view," by recognizing for the first time that Section 1983 is "under the concurrent jurisdiction of federal and state courts." SPA-62-63. Under this supposed "change in . . . view," Section 1983 would no longer qualify under the expressly authorized exception to the Anti-Injunction Act, contrary to *Mitchum*'s express holding. And that cannot be right. Again, the Supreme Court does not overrule its decisions *sub silentio.*

For all these reasons, the District Court's basis for rejecting the "expressly authorized" exception was erroneous. As a result, the District Court should have extended its preliminary injunction to cover Defendants' pending State no-fault actions. And this error of law necessarily amounts to an abuse of discretion.

75

**B.** **The Injunction Was Necessary in Aid of the District Court's Jurisdiction Because Defendants' State-Court Proceedings Would "Seriously Impair" the Court's Ability to Resolve the State Farm Companies' Claims in Any Forum.**

This case also fits squarely within the "in aid of its jurisdiction" exception to the Anti-Injunction Act. 28 U.S.C. § 2283. In *Atlantic Coast Line,* the Supreme Court made clear the exception authorizes injunctions of state-court proceedings that will seriously threaten the federal court's "flexibility and authority to decide [a] case." *Atl. Coast Line*, 398 U.S. at 295. The District Court's inability to award complete relief as to the State Farm Companies' claims rises to that level.

*Capital Service, Inc. v. NLRB*, 347 U.S. 501 (1954), is illustrative—a case that featured parallel state and federal *in personam* actions. There, the National Labor Relations Board asked a district court to enjoin the petitioner from enforcing a state-court injunction of picketing activities. The Supreme Court held the "in aid of its jurisdiction" exception authorized the federal injunction, because the state-court injunction interfered with the federal court's authority to decide the claims before it:

> If the state court decree were to stand, the Federal District Court would be limited in the action it might take. If the Federal District Court were to have unfettered power to

76

decide for or against the union, and to write such decree as it deemed necessary in order to effectuate the policies of the Act, it must be freed of all restraints from the other tribunal.

*Id.* at 505-06. The Supreme Court therefore held that when the district court restrained the state court, "it acted 'where necessary in aid of its jurisdiction.'" *Id.* at 506.

Similarly, in *In re Baldwin-United Corp.,* this Court permitted an injunction of *in personam* proceedings that threatened a federal district court's authority to freely adjudicate a federal action. There, the district court had presided over the near settlement of a multi-district class action. 770 F.2d at 337. Meanwhile, several affected members who declined to participate in the federal proceedings filed state-court proceedings that threatened to derail the settlement. *See id.* According to this Court, "the potential for an onslaught of state actions posed more than a risk of inconvenience or duplicative litigation"; it "threatened to 'seriously impair the federal court's flexibility and authority' to" resolve the federal proceeding. *Id.* at 337 (quoting *Atl. Coast Line,* 398 U.S. at 295).

An injunction here would be identical in purpose and effect to those at issue in *Capital Service* and *Baldwin-United.* It would

77

preserve the District Court's authority, free of all constraints, to fully adjudicate the State Farm Companies' claims of fraud. Otherwise, Defendants, in furtherance of their scheme, will pursue hundreds of individual actions in state courts, where the State Farm Companies cannot adjudicate their claims of fraud. That is because in state court, the State Farm companies will be forced to prove the fraud nearly 3,000 times over, based on the limited facts of each claim—without the benefit of evidence demonstrating the patterns across all claims which are necessary to prove the fraudulent nature of the scheme.

The suits themselves inflict a harm and advance a scheme that the action before the District Court was filed to address. These harms include the risks of adverse judgments, and the time and expenses of defending the claims, which will never be recoverable. Unchecked, the suits will deprive the District Court—and any other court—of the power to fully resolve the State Farm Companies' claims.

In addition, every time Defendants fraudulently prevail in a state-court action, the State Farm Companies face a real risk they will be deemed precluded by *res judicata* from recovering on that claim in this federal action—either in the form of damages, or as part

78

of their declaratory judgment count. Indeed, the District Court recognized there is a real risk that "inconsistent judgments" will hinder full litigation of the declaratory judgment claim through *res judicata.* SPA-43. Thus, as the Supreme Court recognized in *Atlantic Coast Line,* the state-court litigation at issue here threatens to "hinder the federal court's jurisdiction so as to make an injunction necessary to aid that jurisdiction." 398 U.S. at 296; *see also St. Paul Fire & Marine Ins. Co. v. Lack,* 443 F.2d 404, 407 (4th Cir. 1971) (explaining that, in *Am. Ins. Co. v. Lester,* 214 F.2d 578 (4th Cir. 1954), the Fourth Circuit held the Anti-Injunction Act did not prohibit an injunction where a federal court is presented with "a multiplicity of state actions in any one of which all of the interested parties could not, perhaps, have been gathered, and which indicated an 'obvious' attempt by plaintiffs, in the state actions sought to be enjoined, to avoid litigation in a federal forum by filing many separate actions for damages, each for a sum slightly less than the then-required federal jurisdictional amount").

Notably, the State Farm Companies are not seeking an injunction solely so the District Court can be the first to reach judgment. Rather, the State Farm Companies are seeking an

79

injunction here because, in its absence, they risk never being able to present the full scope of their fraud claims for redress. Thus, in the absence of an injunction, the State Farm Companies will be hamstringed in their attempts to prove Defendants' overarching fraud in state court, given the streamlined and piecemeal nature of no-fault proceedings. Similarly, in the absence of an injunction, the District Court may not be able to award the State Farm Companies relief on all the fraudulent claims, because the state-court judgments might bar the full scope of the relief sought in the State Farm Companies' federal complaint.

In addition, the State Farm Companies did not seek an injunction simply because this case is complex. *Cf. Wyly v. Weiss*, 697 F.3d 131, 139 (2d Cir. 2012) (declining to hold that "a district court's involvement in complex litigation justifies, *without more*, issuance of an injunction 'in aid of' the court's jurisdiction" (emphasis added)). Instead, the state-court proceedings stand as a barrier to the State Farm Companies' ability to vindicate their fraud-based claims in either federal or state court. And by relieving the state courts of the heavy obligation of adjudicating the same issue in hundreds—if not thousands—of separate proceedings, an injunction

80

actually furthers the interests the Anti-Injunction Act was meant to preserve—avoiding unnecessary friction between state and federal courts. *See Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987) ("While the Anti-Injunction Act is designed to avoid disharmony between federal and state systems, the exception in § 2283 reflects congressional recognition that injunctions may sometimes be necessary in order to avoid that disharmony.").

For its part, the District Court agreed "the global and intertwined nature of the fraud" risks "frustration of declaratory judgment relief," and "possible 'preclusive effect[ ].'" SPA-44. But the court held this was not enough to satisfy the "in aid of jurisdiction" exception because it read *Baldwin-United* as limited to the facts of that case—that is, as limited to large class actions on the verge of a settlement. And "because the parties have neither agreed to a settlement nor reached the verge of settling," the District Court "decline[d] to apply the in-aid-of-jurisdiction exception to stay the pending state court actions." SPA-28. For this reason, the District Court declined to grant the injunction even where the "right, if any, to litigate the issues in a state court appears more theoretical than real." SPA-25-26.

81

The District Court based its ruling on an improper application of *Baldwin-United*. Though the facts of *Baldwin-United* involved a district court's ability to administer a settlement, the critical point was that the state-court action threatened to impair or defeat the jurisdiction of the federal court: "Any substantial risk of this prospect would threaten all of the settlement efforts by the district court and destroy the utility of the multidistrict forum otherwise ideally suited to resolving such broad claims." *Baldwin-United*, 770 F.2d at 337.

Moreover, the District Court's limited reading of *Baldwin-United* is contrary to *Capital Service*, where the Supreme Court affirmed the issuance of an injunction of an *in personam*, state-court action. 347 U.S. at 505-06. As explained above, the critical feature there was the state-court action threatened to interfere with the federal court's authority to freely decide the issues presented to it. *See id.*

In any event, the facts of this case are analogous to those in *Baldwin-United*. The pending state-court actions in this case, like the class-action proceeding in *Baldwin-United*, are "the virtual equivalent of a res over which the district judge required full control." *Baldwin-United*, 770 F.2d at 337. The District Court is the *only* court "suited to resolv[e] [the] broad claims" of the State Farm Companies' fraud,

82

and continuation of the state-court suits would "destroy" the court's ability to resolve those claims and award the relief requested. *Id.*

In short, an injunction of Defendants' pending state-court actions is "necessary in aid of [the] jurisdiction" of the District Court to fully litigate the issues before it. 28 U.S.C. § 2283.

## IV. As to Defendants' Appeal, the District Court Did Not Abuse Its Discretion in Declining to Require the State Farm Companies to Post Security for the Injunction.

Rule 65(c) of the Federal Rules of Civil Procedures provides a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The District Court has wide discretion to determine whether to require a bond, and may deny a bond altogether where there is no likelihood of harm absent the bond. *Doctor's Assocs.*, 85 F.3d at 985.

Here, the District Court did not abuse its discretion because there is no risk the State Farm Companies will be unable to pay Defendants for any damages in the event the injunction was wrongly issued. The Alon Defendants do not challenge this reality—nor could they. Instead, they argue a bond should have been issued because

83

other district courts have required bonds in other actions involving no-fault claims. Alon Op. Br. 22-23.[11]

But that's not enough to show the District Court abused its discretion in this case, particularly where the Alon Defendants do not dispute the State Farm Companies will be able to satisfy any judgment owed to Defendants. *Cf. United States v. Ramirez,* 297 F.3d 185, 193 (2d Cir. 2002) ("[T]his Court will not upset a district court's determination simply because [this Court] would have reached a different conclusion had [it] considered the matter in the first instance."). Accordingly, the District Court did not abuse its discretion in declining to require a bond.

---

[11] The Metro Pain Defendants do not challenge the District Court's decision not to require a bond.

## **CONCLUSION**

This Court should reverse the portion of the District Court's order declining to preliminarily enjoin the pending state-court litigation, and it should affirm the District Court's order in all other respects.

Dated: February 2, 2023

Jonathan L. Marks
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL  60661-3693
Tel: 312-902-5200

Christopher T. Cook
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020-1605
Tel.: 212-940-6488

Respectfully submitted,

*/s/ Robert T. Smith*
Robert T. Smith
Mary C. Fleming
Ally Jordan
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
North Tower – Suite 200
Washington, DC  20007-5118
Tel:  202-625-3500

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief is in compliance with the type form and volume requirements. Specifically, this brief is proportionately spaced; uses a Roman-style, serif typeface (Book Antiqua) of 14-point; and contains 16,490 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

*/s/ Robert T. Smith*
Robert T. Smith
*Counsel for Plaintiffs-*
*Appellees/Cross-Appellants*

86

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief by tendering it via the CM/ECF system to the Office of the Clerk of the United States Court of Appeals for the Second Circuit on February 2, 2023. I certify that all counsel of record are registered ECF filers and that they will be served by electronic means via the CM/ECF system.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Plaintiffs-
Appellees/Cross-Appellants*